907 So.2d 1190 (2005)
Mae TANNER and Norma A. Atima, Appellants,
v.
Victor BECK, by and through Ruth HAGERTY, Legal Guardian, Appellee.
Nos. 3D04-1200, 3D04-1201.
District Court of Appeal of Florida, Third District.
June 1, 2005.
Rehearing and Rehearing Denied August 17, 2005.
*1191 Papy, Weissenborn, Vraspir & Puga and Sheridan K. Weissenborn, Coral Gables; and Frances F. Guasch and Luis E. Ordonez, Miami, for appellants.
Pivnik & Nitsche and Jerome A. Pivnik, Miami, for appellee.
Before GREEN, WELLS, and ROTHENBERG, JJ.
Rehearing and Rehearing En Banc Denied August 17, 2005.
ROTHENBERG, Judge.
The defendants, Mae Tanner and Norma A. Atima, appeal from an order granting a new trial in favor of the plaintiff, Victor Beck, by and through Ruth Hagerty, Legal Guardian. We reverse.
The plaintiff filed suit against the defendants claiming that he was injured when he slipped and fell while exiting their mobile home in March 2002. Prior to trial, the plaintiff moved in limine to preclude the introduction of any evidence regarding the plaintiff's 1993 slip and fall lawsuit that *1192 he filed in Bradenton, Florida. The trial court ruled that the defendants could introduce evidence of the slip and fall for the limited purpose of establishing the plaintiff's propensity to fall, but ruled that any evidence of the litigation stemming from that accident was inadmissible.
The issue at trial was causation. The plaintiff claimed that he slipped on a cinder block step on the defendants' porch, which he claimed violated the building code. The defendants, however, claimed that the plaintiff either tripped on the sliding glass door threshold while exiting the mobile home or fell because of his own physical infirmities.
The evidence introduced at trial was that the defendants, Mae Tanner and Norma Atima, and the plaintiff, Victor Beck who lived with his mother, Ruth Hagerty, were neighbors residing at the Goldcoast Mobile Home Trailer Park. In March of 2002, Ms. Tanner purchased a hospital bed and another neighbor, George Lermond, offered to help her move the hospital bed into her mobile home. Unbeknownst to Ms. Tanner, Mr. Lermond asked John Dodson and the plaintiff to help him move the bed into Ms. Tanner's home. Prior to asking the plaintiff for help, Mr. Lermond obtained permission from Ms. Hagerty because the plaintiff is physically impaired due to a 1975 motorcycle accident. As a result of the 1975 motorcycle accident, the plaintiff sustained permanent brain injury, lost his left eye, his vision to his right eye is impaired, and he is partially paralyzed on the right side of his body.
After the bed was moved into the mobile home without incident, the plaintiff tripped and fell as he was exiting the mobile home. This exit consisted of a sliding glass door which led out to a flat row of six cinder block steps covered by Astroturf. The plaintiff fell forward onto his right knee, injuring his right leg.
The plaintiff testified at trial that he caught his foot in a gap between the cinder blocks which was concealed by the Astroturf. Three photographs of the threshold/step area were entered into evidence, one of which was taken by Ms. Hagerty. The defense disputed the accuracy of the photograph taken by Ms. Hagerty, which was taken approximately two months after the fall occurred and without the permission of the defendants. The accuracy of these photographs was hotly disputed.
The plaintiff's trial testimony was impeached several times. It was impeached by his prior sworn testimony and the testimony of three witnesses. When the plaintiff was deposed prior to trial, he stated that he did not know what had caused him to fall. He stated that he did not know whether he had caught his foot on the metal threshold of the sliding glass door or whether he had tripped on the metal threshold or whether he simply "stumbled over it." When asked if he had lost his balance when he stepped onto the cinder block steps, he replied "no."
His testimony was also impeached by the other two neighbors who carried the bed into Ms. Tanner's mobile home, George Lermond and John Dodson. Both Mr. Lermond and Mr. Dodson were exiting the trailer with the plaintiff, and actually witnessed the fall. Mr. Lermond, who exited safely just prior to the plaintiff, saw the plaintiff "flying" past him. When Mr. Lermond asked the plaintiff what had happened, the plaintiff responded that he "tripped on the door." Mr. Dodson testified that all three of them had entered the same way they exited, and that the plaintiff had no difficulty when entering the home. Mr. Dodson's testimony reflects *1193 that he was behind the plaintiff as they left the mobile home and observed the plaintiff as he "kind of drug it [his foot] across the threshold of the sliding glass door, causing him to trip, and he fell forward and landed on his knee." Mr. Dodson explained that it looked like the plaintiff's sandal got caught on the runner of the sliding glass door, which caused him to trip and pitch forward:
[Defense Counsel]: Is there any question in your mind, but that Victor's fall was caused by his sandal getting caught in the runner for the sliding glass door?
[Mr. Dodson]: None, whatsoever.
Dr. Kreitman, who examined the plaintiff on December 5, 2002, also testified. His testimony reflects that Ms. Hagerty told him that her son did not know what had caused him to fall but he did fall injuring his right leg. Dr. Kreitman stated that the plaintiff was also unclear as to what had caused his fall.
The plaintiff's trial testimony was inconsistent with his deposition testimony, the history he provided to Dr. Kreitman, and the testimony of the two eye witnesses to the fall. The plaintiff, however, attempted to bolster his testimony with the introduction of a photograph taken by his mother approximately two months subsequent to the fall. As stated earlier, the defendants disputed the accuracy of this photograph. The plaintiff testified that the photographs he introduced, one of which was taken by his mother, accurately depicted the doorway and steps where he tripped. However, when cross-examined by defense counsel, the plaintiff changed his testimony and stated that the steps pictured in plaintiffs exhibits #1 and #3 did not depict how the steps looked on the day he fell. He claimed that they were spaced differently, and at first, he even testified that on the day in question, there was no Astroturf carpet covering the cinder blocks. He then contradicted himself testifying that there was carpeting, but that "it was all ripped up."
Mr. Dodson testified unequivocally that as long as he has known Ms. Tanner, there has been carpeting covering the row of cinder blocks used to shorten the step down from the threshold to the patio. To his knowledge, no one had ever had any difficulty navigating the steps in the past and he had never seen them lined up unevenly or with spaces between them.
Ms. Hagerty testified that, while she took the photograph when Ms. Tanner was not home, she did not alter the scene and that she took the photograph through her screened-in porch. The photograph taken by Ms. Hagerty that was introduced into evidence contradicted her testimony as no evidence of screening was present in the photograph. More importantly, however, was Ms. Hagerty's admission that she had taken the photograph approximately two months after the accident and had no idea what the steps looked like on the day of her son's fall.
The defense additionally introduced substantial evidence from which the jury could have concluded that the plaintiff's fall was as a result of his own infirmities. It was established without dispute that the plaintiff was involved in a motorcycle accident in 1975 and since that accident, has been under the care of Ms. Hagerty, who, in fact, has power of attorney over his affairs and is his legal guardian. As a result of this accident, the plaintiff lost his left eye, his vision in the right eye is impaired, he is partially paralyzed on the right side of his body, and he has permanent brain damage. While the plaintiff claimed that he recovered *1194 after five years of rehabilitation, he fell in 1993 and broke his knee in Bradenton while attempting to maneuver on a ramp for the disabled.
Additionally, the undisputed evidence introduced at trial established that between 1994 and the plaintiff's fall at the defendants' home in 2002, the plaintiff was seen by several doctors regarding the "increased incidents of falling and dropping things from his hands." For example, Dr. Trainer, a neurologist, saw him in August 1994, for an evaluation, as did Dr. Weiss, a vascular surgeon, in 1998. In 2001, his mother took him to see another neurologist, Dr. Raicher, due to his unsteadiness and loss of balance. This visit was within one year preceding the plaintiff's fall at the defendants' mobile home. A record from Mariner's Hospital reflects that the plaintiff fell off of a ladder and was treated for a laceration. Also, in 2000, when the plaintiff applied for social security benefits, Ms. Hagerty filled out a form wherein she stated that she prepares his meals for him because his gait is unsteady at times, his hands sometimes have tremors, that he only has the use of one eye with no peripheral vision, and that sometimes he does not see people or objects.
During closing argument, the defense argued that: (1) the plaintiff tripped on the metal threshold of the sliding glass door, not on the cinder blocks step; (2) the plaintiff fell due to his own infirmities; (3) the plaintiff was not a credible witness as his trial testimony conflicted with his own deposition testimony, the testimony of two eye witnesses with no motive to lie, and with the testimony of a physician whom he spoke to several months after the injury; and (4) the photographs introduced by the plaintiff were not relevant nor reliable as they were taken some time after the incident in question, under suspicious circumstances, and where the plaintiff himself disputed their accuracy.
Defense counsel made the following comment during closing argument:
You can see how the mind works. Look at this. This is 1993, we have almost the identical situation. This is when he tripped over in Bradenton. And it is very similar to this. There is a raised ledge at the threshold, kind of like this. His mother, click, click, click, you know how it works, his mother feels that the raised ledge was a little over an inch and was not painted a bright color.
The plaintiff objected and a sidebar conference was held. Thereafter, the trial court issued a curative instruction, instructing the jury to disregard the comment and to only consider the prior fall in determining whether the plaintiff had a propensity to fall. The curative instruction given by the court is as follows:
Members of the jury, [defense counsel] just made some reference in his argument about [Ms. Hagerty] and clicking noises saying you know how the mind works. I am sustaining the objection made by the Plaintiff in regard to that. I want you to disregard that. The evidence I allow [sic] regarding the accident before, I allowed in because the defendants wanted to argue that he had a propensity to fall and that is the only reason you should consider with regard to that.
The jury found in favor of the defendants finding that they were not negligent. The plaintiff moved for a new trial arguing, in part, that defense counsel's "click, click, click" comment during closing argument improperly referred to the prior lawsuit in violation of the trial court's ruling *1195 on the motion in limine. The trial court granted the motion for new trial solely on that basis. This appeal followed.
The defendants contend that the trial court abused its discretion by granting a new trial, as the statement in question was clearly neither inflammatory nor prejudicial, and did not violate the order in limine. In response, the plaintiff argues that this court must affirm because the record on appeal is inadequate as there is no transcript of the discussion concerning the motion in limine or of the sidebar conference following the plaintiff's objection to the allegedly improper argument. Further, the plaintiff notes that the trial court's ruling on a motion for new trial comes to this court with a presumption of correctness.
The dissent is persuaded by the plaintiff's argument that there is an insufficient record for appellate review of the trial court's order granting a new trial because there is no record of the pretrial discussion regarding the motion in limine or of the sidebar conference where the plaintiff argued that the motion in limine had been violated. The dissent has additionally concluded that because the court reporter filed a corrected transcript of the proceedings below, that the record on appeal is "suspect" and "problematic for our appellate review." We respectfully disagree.
The dissent has labeled the record on appeal "suspect" because the court reporter submitted a corrected transcript of the proceedings below. We note that the attorneys involved in this appeal have not argued that we should make such a finding and have not even suggested a basis for this conclusion. We have carefully reviewed the different versions of the transcript and, after doing so, we do not find the transcript or the court reporter's actions to be "suspect," nor do we find any reason to impugn the integrity of the court reporter. More importantly, we find no violation of the motion in limine regardless of the version relied upon, and note that neither attorney disputes the substance of the alleged improper argument, nor argues that the record is "suspect" or one which cannot be relied upon. As the attorneys do not dispute what the complained-of argument was, we see no reason to conclude that the submission of the corrected transcript is in any way an issue which merits serious consideration.
We reach the same conclusion regarding the "incomplete" record which the dissent concludes is "problematic." The fact that there is no transcript of the hearing on the motion in limine or of the sidebar conference, is not fatal to this appeal. There is absolutely no dispute as to the trial court's ruling on the motion in limine. The parties agree that the trial court ruled that the 1993 slip and fall accident was admissible to establish the plaintiff's propensity to fall, but that the litigation stemming from the accident was inadmissible. It is also undisputed that the plaintiff contemporaneously objected to defense counsel's closing argument, and that a curative instruction was given. As such, we fail to see how the failure to record the discussions regarding the motion in limine or the sidebar conference impairs our ability for a full and fair review. We, therefore, conclude that the defendants have met their burden of providing this court with a sufficient record. See Bass Orlando Lee Road, Inc. v. Lund, 702 So.2d 250, 251 n. 1 (Fla. 4th DCA 1997)(excusing the appellant's failure to provide the appellate court with a copy of an affidavit submitted below when the appellee did not contest the existence of the affidavit or its contents).
*1196 In addressing the merits of this appeal, we note that it is within the sound discretion of the trial court to grant a motion for new trial based on an improper comment made by opposing counsel during closing argument. A new trial should be granted if the comment was so highly prejudicial and inflammatory that it denied the opposing party its right to a fair trial. Maksad v. Kaskel, 832 So.2d 788, 793 (Fla. 4th DCA 2002); Leyva v. Samess, 732 So.2d 1118, 1121 (Fla. 4th DCA 1999). Absent an abuse of discretion, the granting of a new trial will not be disturbed on appeal. See Brown v. Estate of Stuckey, 749 So.2d 490, 497-98 (Fla.1999). Moreover, we are also mindful of the superior vantage point enjoyed by the trial judge, which this court and other appellate courts have traditionally deferred to when considering a motion for new trial. Allstate Ins. Co. v. Manasse, 707 So.2d 1110, 1111 (Fla. 1998).
Were we to agree with the premise upon which the trial court relied and merely disagree with the trial court's decision as to whether to grant a new trial based upon that premise, we would not reverse. We reverse the trial court's order granting a new trial because, based on our review of the objected-to comment, we conclude that: (1) defense counsel did not violate the motion in limine; (2) his argument was fair argument in light of the evidence presented at trial; and (3) even if the jury could have drawn an improper inference from this comment, any potential prejudice was cured by the trial court's subsequent admonition and curative instruction.
Pursuant to the motion in limine filed by the plaintiff, the trial court permitted the defense to introduce evidence regarding the 1993 fall in Bradenton which occurred on a ramp for the disabled, but precluded the introduction of any evidence regarding the litigation associated with the fall. In closing argument the defense argued that in a situation almost identical to the 2002 fall at the defendants' home, "His mother, click, click, click, you know how it works, his mother feels that the raised ledge was a little over an inch and was not painted a bright color..." In the original transcript, the court reporter transcribed defense counsel's argument as follows:
[Y]ou can see how the mind works. Look at this. This is 1993. We have almost the identical situation. This is when he tripped over in Bradenton. Here and its very similar to this. There's a raised ledge at this threshold, kind of like this. His mother, you know, put, put, put, put, you know how it works. His mother feels that the raised ledge was a little over an inch and was not painted a bright color. . . .
In the corrected transcript, the court reporter transcribed defense counsel's argument thusly:
[Y]ou can see how the mind works. Look at this. This is 1993, we have almost the identical situation. This is when he tripped over in Bradenton. And it is very similar to this. There is a raised ledge at the threshold, kind of like this. His mother, click, click, click, you know how it works, his mother feels that the raised ledge was a little over an inch and was not painted a bright color. . . .
As the attorneys and the trial court have relied upon the corrected version, we will do so as well, even though we find neither version to be violative of the motion in limine. At no time did defense counsel clarify what the "click, click, click" was that he was referring to. A jury could infer that the "click, click, click" was simply *1197 a reference to the photograph that Ms. Hagerty took in preparation for this case, which defense counsel contends did not accurately depict the scene on the day in question, or they could infer that perhaps Ms. Hagerty also took pictures in 1993. The trial court's curative instruction suggests a third interpretation, which is that the "click, click, click" represents Ms. Hagerty's mind, suggesting that she took photographs for the purpose of the present litigation, which in fact was the case. At no time did defense counsel state nor infer that the 1993 fall led to litigation. Thus, we conclude that defense counsel did not violate the motion in limine.
As the defendants claimed that the photograph taken by Ms. Hagerty did not accurately reflect how the steps appeared at the time of the accident and the plaintiff actually testified that they were inaccurate, the accuracy of the photograph was clearly at issue. Since the accuracy of the photograph drew into question Ms. Hagerty's credibility and her motivation, the defense counsel's comment in closing was fair argument.
Additionally, we find that even if the jury could have inferred from counsel's statement that Ms. Hagerty took pictures in 1993 for the purpose of potential litigation, we conclude that the error was harmless because Ms. Hagerty's motivation was relevant in determining the accuracy of the photograph; the complained-of comment was not of such a nature that it deprived the plaintiff of a fair trial; and any potential prejudice was cured by the trial court's curative instruction. See Dozier v. Hodges, 849 So.2d 1094, 1095 (Fla. 3d DCA 2003)(finding that the trial court properly denied a motion for new trial when the trial court sustained all appropriate objections, gave curative instructions where appropriate, and that the evidence supported the jury verdict). As we conclude that the objected-to comment was harmless error at best, the trial court abused its discretion in granting a new trial.
In the dissent, it is also argued that the trial court's conclusion in granting a new trial should be affirmed on appeal based upon omissions from the corrected transcript including two objected-to arguments, one of which was sustained and one which was not, and others which were not objected to. As the motion for new trial did not address any of these arguments and the trial court's order granting a new trial was based solely upon its conclusion that the defense violated the motion in limine by making the "click, click, click" comment during closing argument, and that this specific comment was improper and may have affected the verdict, we have confined our review to the grounds raised in the motion for new trial and the grounds asserted by the trial court in its order granting the motion for new trial.
Reversed and remanded to reinstate the jury's verdict.
WELLS and ROTHENBERG, JJ., concur.
GREEN, J. (dissenting).
Appellate courts across this state have traditionally granted great deference to a trial court's decision to order a new trial based on improper argument of trial counsel. Allstate Ins. Co. v. Manasse, 707 So.2d 1110, 1111 (Fla.1998). "The discretionary power to grant or deny a motion for new trial is given to the trial judge because of his direct and superior vantage point." Baptist Mem'l Hosp., Inc. v. Bell, 384 So.2d 145, 146 (Fla.1980). "Mere disagreement from an appellate perspective is *1198 insufficient as a matter of law to overturn a trial court on the need for a new trial. The trial judge `was in a much better position than an appellate court to pass on the ultimate correctness of the jury's verdict.'" Baptist Mem'l Hosp., 384 So.2d at 146 (citing Castlewood Int'l Corp. v. LaFleur, 322 So.2d 520 (Fla.1975)). See Brown v. Estate of Stuckey, 749 So.2d 490, 497-98 (Fla.1999)("When reviewing the order granting a new trial, an appellate court must recognize the broad discretionary authority of the trial judge and apply the reasonableness test to determine whether the trial judge committed an abuse of discretion. . . . The fact that there may be substantial, competent evidence in the record to support the jury verdict does not necessarily demonstrate that the trial judge abused his or her discretion.") (emphasis added). In fact, an even "stronger showing is required to reverse an order allowing a new trial than to reverse an order denying a motion for new trial." State Farm Fire & Cas. Co. v. Higgins, 788 So.2d 992, 1006 (Fla. 4th DCA 2001) (citing Cenvill Communities, Inc. v. Patti, 458 So.2d 778, 781 (Fla. 4th DCA 1984)). The Florida Supreme Court has described our standard of review of such orders thusly:
Since at least 1962, it has been the law of Florida that a trial court's discretion to grant a new trial is "of such firmness that it would not be disturbed except on clear showing of abuse. . . ." A heavy burden rests on appellants who seek to overturn such a ruling, and any abuse of discretion must be patent from the record.
Castlewood, 322 So.2d at 522 (citations and footnote omitted).
By virtue of this well-settled law, I must respectfully dissent from the reversal of the order granting a new trial in this case.
In reversing the order under review, the majority opinion has failed to give that order the appropriate deference and the presumption of correctness to which it is clearly entitled. I am even more troubled by a reversal in this particular case because the accuracy of the purported "record" on appeal before us is suspect. Critical portions of the trial were not recorded or, if recorded, were inexplicably altered by the court reporter. Given the state of this record, I do not believe that it is appropriate for us to second guess the trial court's decision to grant a new trial in this case.[1]

I. Underlying Facts
This suit arose as a result of a trip and fall accident that occurred on March 16, 2003, at the entrance to defendant/appellant Mae Tanner's mobile home. Plaintiff/appellee Victor Beck, who is mentally and physically disabled as a result of a 1975 motorcycle accident,[2] tripped as he was exiting Tanner's home and sustained injuries. Beck was assisting neighbors John Dodson and George Lermond move a bed into Tanner's home. The entrance to Tanner's mobile home was through a sliding glass door. There were cinder block steps covered by a piece of Astroturf carpet in front of the sliding glass door. According to the plaintiff's allegations, these cinder blocks were unevenly spaced, with *1199 large gaps in between them; this dangerous condition was concealed by the Astroturf carpet. Plaintiff additionally alleged that the sliding glass door had a metal threshold that protruded over the carpet and presented a tripping hazard.

II. Trial and Purported Record
The central issue in this case was causation: Whether Victor Beck tripped and fell over the sliding glass door's threshold while exiting Tanner's home, or whether he fell as a result of the gaps in the cinder block steps. The plaintiff maintained that he caught his foot on a crack in the cinder block steps, concealed by the Astroturf carpet. As his foot sunk into the gap, the plaintiff contends that he fell and sustained a serious fracture to his leg/knee, which required two surgeries.[3] The plaintiff adduced expert testimony that the steps were a dangerous hazard and violated certain building codes and caused and/or contributed to Beck's accident.
The defense, on the other hand, contended that Beck tripped over the threshold rail when his sandal got caught on the runner. The defense asserted that the gaps in the steps were not a factor in the accident, or, alternatively, that Beck's accident was the result of his pre-existing physical disabilities. The defense presented testimony of the eye witnesses, Dodson and Lermond, to support these theories.
Within eleven days of the accident, on March 27, 2002, Tanner's insurance adjustor took photographs of the steps and entrance. These photos were introduced into evidence as plaintiff's exhibits 1 and 2. Several weeks after the accident, the plaintiff's mother, Ruth Hagerty, also took a photograph of the steps, which was introduced as plaintiff's exhibit 3. At trial, although the plaintiff redacted any reference to the fact that photo exhibits 1 and 2 had been taken by an insurance adjuster, the court would not permit the plaintiff to disclose the fact that these photos had been taken by or on behalf of the defense. As for exhibit 3, taken by plaintiff, the defense informed the jury that Beck's mother, Hagerty, had taken this photo of the steps without Tanner's permission. The defense insinuated that Hagerty may have moved the blocks around and that the photo did not accurately depict the blocks on the day of the accident.
The trial in this case lasted only two days and, as previously stated, involved the heavily contested issue of causation. This issue, in turn, hinged primarily on the credibility of the mentally-challenged plaintiff versus the testimony of the other two movers; defendant Tanner did not witness the accident. Despite the trial's short duration, the court reporter was either not present for all phases of the trial or, when present, was not utilized during certain phases of the trial.
Just prior to the commencement of the trial, plaintiff filed a written motion in limine seeking to exclude, among other things, any evidence of a trip and fall accident lawsuit that he filed in Bradenton, Florida, in the 1990's. The court reporter was not present for the argument of counsel on this motion or the court's ruling on same. As pointed out by the majority, the parties appear to agree that the court ruled that Beck's earlier trip and fall was admissible to establish his propensity to fall. However, the court ruled that any evidence of the litigation stemming from that accident was excluded. See maj. op. at 1192.
The propriety of the court's ruling on the motion, however, is not an issue presented *1200 on this appeal. Rather, the issue is whether the defense violated that ruling during closing arguments. This is where the absence of a credible record on appeal becomes problematic for our appellate review.
There are inexplicably three different versions of defense counsel's closing argument in four different transcripts. In one version, filed by the appellee/plaintiff, the court reporter transcribed defense counsel's closing as follows:
And there's a desire you know, you can see how the mind works. Look at this. This is 1993. We have almost the identical situation. This is when he tripped over in Bradenton. Here and its very similar to this. There's a raised ledge at this threshold, kind of like this. His mother, you know, put, put, put, put, you know how it works. His mother feels that the raised ledge was a little over an inch and was not painted a bright color. . . .
(emphasis added). In a purported "corrected" version of this closing argument, the court reporter transcribed this same argument as follows:
You can see how the mind works. Look at this. This is 1993, we have almost the identical situation. This is when he tripped over in Bradenton. And it is very similar to this. There is a raised ledge at the threshold, kind of like this. His mother, click, click, click, you know how it works, his mother feels that the raised ledge was a little over an inch and was not painted a bright color. . . .
(emphasis added). Given these different transcribed versions of the defense's argument, it is not possible to ascertain with any degree of certainty exactly what the offending argument was. Thus, the majority's supposition that defense counsel was merely referring to pictures taken by Beck's mother is simply that. See maj. op. at 1193.
Moreover, after plaintiff's counsel objected to whatever was stated by defense counsel, the court summoned the attorneys side bar to argue the objection. Although the court reporter was present in the courtroom, the court reporter inexplicably did not join counsel side bar to transcribe the argument. Defense counsel may very well have clarified or attempted to clarify what he meant by the challenged argument. But again, we have no way of knowing for certain. In any event, the trial court sustained the plaintiff's objection to the argument and issued a curative instruction.
The variations in the transcripts, however, are not problematic simply because defense counsel may have uttered the words "click, click, click," or "put, put, put," during his closing arguments. Rather, as the appellee points out, the "corrected" transcript omits several pages of improper arguments made by defense counsel to the jury.
For example, in one version of the trial transcript, the appellee points out that defense counsel argued that the plaintiffs needed sympathy to prevail:
[Defense Counsel]: I heard Counsel tell you just now, you know, we're not asking for sympathy . . . They need sympathy. . . . They can't get a verdict without sympathy. . . . Otherwise, why would
[Plaintiff's counsel] . . . ask Ms. Hagerty about this unfortunate health condition that she had. . . .
[Plaintiff's Counsel]: Objection. . . .
[The Court]: Sustained.
This was omitted from the "corrected" transcript.
*1201 An additional improper argument, made by defense counsel and omitted from the "corrected" transcript, was that the appellant Tanner's testimony was believable because she was an elderly woman who was about to meet her maker:
[Defense Counsel]: You can believe some of the old folks sometimes, because old folks are so close to meeting their maker that they would be scared to tell a lie.
[Plaintiff's Counsel]: Objection.
[The Court]: Overruled.
There were still further unobjected-to arguments advanced by the defense counsel that the appellees maintains were improper that were mysteriously omitted from the "corrected" transcript of the trial. The appellee points to his transcript showing that defense counsel argued to the jury that the plaintiff was knowingly presenting a false or concocted claim:
The point is, it's even before your were picked, we all knew what happened. All of us. Lawyers over here and lawyers over there (pointing to Beck's counsel). . . Because in opening statement, [Plaintiff's Counsel] told you that Victor stepped into the cinder block, his foot pushed into the gap. He lost his balance and fell. That isn't what Victor said in the deposition. Nobody said that, where did it come from? . . . The fact is and this is from [Plaintiff's Counsel]. . . So the question is where does that come from? . . . It comes from the desire to hang the responsibility and put it on the shoulders of these two people over here. That's where it comes from. . . .
* * *
Now, [Plaintiff's Counsel] knows what caused him to fall, but the witness [Plaintiff] does not . . . [Plaintiff's Counsel] has been the witness to testify about what happened in this case.
* * *
[Mrs. Hagerty] doesn't tell May Tanner she is going to take pictures, she waits for when May Tanner isn't home and then she takes pictures of her dear friend's porch. Obviously, a driving force. And you have to ask yourself . . . is this a real case of negligence or is this something that has been contrived?

III. Conclusion
Given the inexplicable exclusion of these (and perhaps other) arguments from the purported "corrected" transcript of the trial, I do not believe that the record before us is sufficiently reliable for us to second-guess the exercise of the trial court's broad discretion in ordering a new trial. The discrepancies in the various transcripts highlight the need for us to defer to the discretion of the trial court even if it reached the right result for the wrong reason. See State Farm Fire & Cas. Co. v. Levine, 837 So.2d 363 (Fla.2002); Cardelle v. Cardelle, 645 So.2d 22 (Fla. 3d DCA 1994). The appellants have simply failed in their duty to provide us with an adequate and/or credible record to demonstrate that the trial court abused its discretion. See Applegate v. Barnett Bank of Tallahassee, 377 So.2d 1150, 1152 (Fla.1979)("The trial court should have been affirmed because the record brought forward by the appellant is inadequate to demonstrate reversible error."); Hill v. Hill, 778 So.2d 967 (Fla.2001)(in absence of adequate record affirmance is required); Poling v. Palm Coast Abstract & Title, Inc., 882 So.2d 483 (Fla. 5th DCA 2004)(trial court assumed correct absent a record that demonstrates error).
*1202 In granting the plaintiff's motion for new trial, the trial judge, who was in a far superior position to assess the effect of the prejudice of any improper closing argument, aptly summed it up as follows:
[The Court]: All right. I think it is a case that could have gone either way.
I think, you know, it was a hard-fought case that could have gone either way, but I think the jury was affected by the comment.
I could see no reason for making that comment other than to make the jury to [sic] think that his mother sets up law-suits.
Mr. Papy last time argued that Ms. Gross was trying to say blame, she is looking for somebody to blame. It is the same as suing somebody. Blame and suing somebody is the same. She is always looking for somebody to sue.
I allowed it in. That issue was hard fought. I think I was correct in allowing you, the defendant, the leave to talk about the prior incident merely to show propensity and to show how somebody thinks. That they want to ascribe blame somewhere, that is not the way to do it.
If you want to talk about her credibility, you can talk about her credibility. But talking about that she is looking for excuses, there was a raised step three years ago, I think that that jury was left with the impression that here is a person who likes to sue people, and that's in violation of my order . . .
Since it is going up, it is just going to go up with the appellate court knowing how I feel. I'm the one who was watching it, and that's what I believe. I believe it affected the verdict.

(emphasis added).
Indeed.
NOTES
[1] Contrary to the majority's representation, the appellees did raise the problems with the different transcript versions, and their unreliability, in their brief, and in their motion to dismiss the appeal.
[2] As a result of this accident, Beck sustained permanent brain damage, lost his left eye, suffered impaired sight in his right eye and partial paralysis of his side. Despite these disabilities, however, Beck was mobile.
[3] During one such surgery, he suffered a near fatal pulmonary embolism.