# Third District Court of Appeal

## State of Florida

Opinion filed March 18, 2015.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D13-2597
Lower Tribunal No. 7-30336
_____

## R.J. Reynolds Tobacco Company,
Appellant,

vs.

## Ralph Ballard, et al.,
Appellees.

An Appeal from the Circuit Court for Miami-Dade County, Michael A. Genden, Judge.

Carlton Fields Jorden Burt, P.A., and Benjamine Reid and Alina Alonso Rodriguez; Jones Day, and Gregory G. Katsas (Washington DC); Jones Day, and Charles R. Morse (New York), for appellant.

The Mills Firm, P.A., and John S. Mills and Courtney Brewer (Tallahassee), for appellees.

Before ROTHENBERG, LOGUE and SCALES, JJ.

SCALES, J.

In this Engle[1] progeny case, defendant below, R.J. Reynolds Tobacco Company ("Reynolds"), appeals a judgment in favor of the plaintiffs, Ralph Ballard and his wife, Maria Ballard. Reynolds claims the trial court erred by: (1) failing to direct a verdict for Reynolds as to Mr. Ballard's membership in the Engle class; (2) not granting a new trial based on improper comments made by plaintiffs' counsel during closing and rebuttal arguments; (3) admitting certain evidence of Reynolds' misconduct; (4) failing to direct a verdict for Reynolds as to the conspiracy claim; (5) failing to instruct the jury on the statute of repose; (6) accepting the jury's verdict regarding compensatory damages; and (7) giving res judicata effect to the Engle findings.

We write only to address the class membership issue and two of the comments made by plaintiffs' counsel during closing and rebuttal arguments. We affirm without discussion all remaining issues.

---

[1] Engle v. Liggett Grp., Inc., 945 So. 2d 1246 (Fla. 2006). In Engle, although the Florida Supreme Court held that this Court erred in its post-judgment decertification of a class of smokers and their survivors (on the basis that this Court was bound by this Court's prior affirmance of the class certification), the Florida Supreme Court found that "[t]he pragmatic solution [was] to . . . decertify the class" while retaining and giving res judicata effect to certain liability determinations made by the jury (the "Engle Phase 1 findings"). Id. at 1266, 1269. In order to receive the res judicata effect of the Engle Phase I findings, the Engle Court gave individual class members—i.e., Florida residents and their survivors, who have suffered, presently suffer, or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine—one year from the issuance of Engle's mandate to file individual damages actions. Id. at 1269, 1277.

## I.  **Background**

The plaintiffs sued Reynolds for negligence, strict liability, fraudulent concealment, and conspiracy to fraudulently conceal. The plaintiffs alleged that various design defects in Reynolds' cigarettes, coupled with Reynolds' concealment or omission, and agreement to conceal or omit, material information regarding the health effects and/or addictive nature of smoking, caused Mr. Ballard to smoke cigarettes and ultimately develop bladder cancer.

Whether Mr. Ballard was addicted to cigarettes—and, therefore, whether the plaintiffs were entitled to the res judicata effect of the Engle Phase I findings—was hotly disputed at the trial.

### A. *Trial Testimony Regarding Addiction*

The plaintiffs' expert, Dr. Henningfield, testified about addiction generally and explained the indicia of nicotine addiction. Dr. Henningfield reviewed the criteria for substance dependence under the DSM-IV, a standard classification he explained, that is used to assess whether someone is addicted to nicotine in cigarettes.

Dr. Henningfield also testified regarding the Fagerstrom Test for Nicotine Dependence which assesses addiction based on, *inter alia*, (i) how soon an individual smokes the first cigarette upon waking up; (ii) whether it is difficult to refrain from smoking when and where the individual is not supposed to; and (iii)

how many cigarettes are smoked per day. In Dr. Henningfield's opinion, the first and third factors are the most indicative of addiction. He testified, "if someone is smoking more than a pack of cigarettes per day, virtually every day, that is a sign that they are very likely heavily dependent." Additionally, regarding the "waking-up cigarette," Dr. Henningfield testified, "people that smoke more quickly when they get out of bed regularly are more likely to have . . . higher nicotine levels in their blood, stronger withdrawal, difficulty in quitting, so forth."

Dr. Henningfield explained that the Fagerstrom Test is a fairly simple, straightforward way to assess dependence and level of dependence. He testified that the assessment need not be conducted by a psychiatrist, psychologist, or other medical professional; in fact, the test can be objectively performed by lay people.

Following Dr. Henningfield's testimony, Mrs. Ballard's deposition testimony was read to the jury.[2] For as long as Mrs. Ballard could remember, Mr. Ballard always smoked about a pack a day. He smoked while sitting on the bed and watching television. Throughout the 1980s, Mr. Ballard tried to quit "every single week;" he would quit "on a Monday, and by Wednesday, he [was] smoking again." He finally quit for good in 1990.

Mr. Ballard testified next. He began smoking in 1942, at the age of sixteen, when he joined the Marine Corps. He started out smoking Chesterfield cigarettes;

---

[2] Mrs. Ballard's medical condition at the time of trial prevented her from testifying live.

he switched to smoking Lucky Strikes, Marlboros, Winstons, and finally to Vantages. Smoking was the first thing Mr. Ballard did in the morning and the last thing he did at night. He smoked everywhere, e.g., inside his house, at the dinner table, and in the car. Mr. Ballard found it difficult to refrain from smoking in places where it was forbidden. He smoked one to two packs a day. He smoked when he was ill and even when he was in the hospital after he was injured in the war. Mr. Ballard first tried to quit in 1977, when a doctor informed him that he had emphysema and that he should not be smoking.[3] His desire to smoke was so strong that he lasted only a couple of days without a cigarette before he abandoned his attempts to quit. Beginning in 1989, Mr. Ballard tried harder to quit. He would go about a week without a cigarette before he returned to smoking. It was a struggle. When he finally quit for good, in 1990, he became irritable and had difficulty concentrating. Mr. Ballard testified that he was addicted to smoking cigarettes.

At the close of plaintiffs' case, Reynolds moved for a directed verdict on the dispositive issue of class membership. Reynolds argued that the plaintiffs failed to present sufficient evidence from which the jury could find that it was an addiction to cigarettes, rather than Mr. Ballard's voluntary choice to smoke, which caused Mr. Ballard's bladder cancer. The trial court deferred ruling. At the close of all the

---

[3] Reynolds introduced Mr. Ballard's deposition testimony at trial in which Mr. Ballard stated that he never attempted to quit smoking before 1990.

evidence, and again after the jury reached its verdict, Reynolds renewed its motion for directed verdict, which the trial court denied. This is the first issue on appeal.

B. *Improper Arguments*

In the alternative, Reynolds contends it is entitled to a new trial because the plaintiffs introduced various improper arguments that were highly prejudicial and denied Reynolds a fair trial.

Specifically, Reynolds takes issue with the following statements made by plaintiffs' counsel during closing argument:

> And by the way, it didn't stop. And we heard some of that here, right, when I was cross-examining Dr. Phillips [Reynolds' expert witness], I go Dr. Phillips, you know, the science is out there, the science says this, the government says this. He goes, well, there's some controversy about that. Are you kidding me? You guys are still doing that? Are you still doing that, are you still creating doubt and confusion in this courtroom?

Reynolds' objection to the above-statements was sustained, and the statements were stricken from the record.

Reynolds also takes issue with the following comments made by plaintiffs' counsel during rebuttal argument:

> And when they [Reynolds] come in here and they say they're not disputing the [Engle] findings, we don't dispute. Well, what do you mean you don't dispute? You spent the whole hour [of Reynolds' closing argument] saying that we didn't know. Well, then when did you conceal? When did you conspire?
>
> I didn't hear them once saying, yeah, we concealed and we conspired, not once. Did you hear them say that? All they said was we don't

6

dispute it. Well, does that mean that you don't admit it? Because that's the law of this case, they did. And somebody got hurt.

After the jury reached its verdict, Reynolds moved for a new trial arguing, *inter alia*, the alleged impropriety of these arguments denied it a fair trial. The trial court denied Reynolds' post-trial motion for a new trial. This is the second issue on appeal.

## II.    Analysis

### A. *Directed Verdict on Class Membership*

"Our review of the denial of the motion for directed verdict is de novo, viewing all of the evidence presented and all available inferences from that evidence in the light most favorable to [the non-moving party]." Maggolc, Inc. v. Roberson, 116 So. 3d 556, 558 (Fla. 3d DCA 2013). "A directed verdict 'should not be entered if the evidence is conflicting and permits different, reasonable inferences.'" Boulton Agency, Inc. v. Phoenix Worldwide Indus., Inc., 698 So. 2d 1248, 1250 (Fla. 3d DCA 1997) (quoting Riccio v. Allstate Ins. Co., 357 So. 2d 420, 422 (Fla. 3d DCA 1978).

To establish that Mr. Ballard is a member of the Engle class—and, therefore, entitled to the res judicata effect of the Engle Phase I findings—the plaintiffs were required to prove that Mr. Ballard "suffered or . . . died from diseases and medical conditions caused by [his] addiction to cigarettes containing nicotine." Engle, 945 So. 2d at 1256.

7

Reynolds argues that the evidence used to prove Mr. Ballard's addiction to cigarettes was insufficient because the only individualized testimony on addiction came from Mr. Ballard himself, who was not qualified to offer expert testimony on the matter. Reynolds characterizes Dr. Henningfield's testimony as general, rather than individualized. Reynolds contends that Dr. Henningfield, who was unfamiliar with Mr. Ballard, merely identified generic criteria relevant to the question of addiction, and impermissibly left the applicability or non-applicability of the criteria to be filled in by lay testimony. We disagree with Reynolds' position.

The plaintiffs presented both expert and lay evidence to prove that Mr. Ballard was addicted to cigarettes. It is true that Dr. Henningfield was unable to apply his knowledge of nicotine addiction directly to Mr. Ballard because he did not know Mr. Ballard and had never examined him or his medical records. Mr. and Mrs. Ballard, however, testified about Mr. Ballard's smoking history, habits, and behavior. Mr. and Mrs. Ballard's descriptions matched the factors Dr. Henningfield described as indicative of nicotine addiction, including smoking the first cigarette of the day early in the morning, heavy daily cigarette consumption, and smoking even when ill. Thus, the jury had the opportunity to compare Mr. and Mrs. Ballard's testimony about Mr. Ballard's smoking history, habits, and behavior with the indicia of nicotine addiction as described by Dr. Henningfield.

We adopt the reasoning and holding of our sister court in <u>R.J. Reynolds Tobacco Co. v. Brown</u>, 70 So. 3d 707 (Fla. 4th DCA 2011). In <u>Brown</u>, R.J. Reynolds argued that the evidence used to prove the decedent's addiction was insufficient because solely lay testimony was used to prove addiction. <u>Id.</u> at 717. The Fourth District found, "[a]fter viewing the expert and lay testimony collectively . . . sufficient evidence existed for a jury to conclude [the decedent] was addicted to RJR cigarettes containing nicotine, and that this addiction was the legal cause of his death." <u>Id.</u>

   B. *New Trial Because of Improper Arguments*

Reynolds argues alternatively that it is entitled to a new trial because in closing and rebuttal arguments, plaintiffs' counsel impermissibly attacked Reynolds for defending this case.[4]

We review a trial court's order granting or denying a motion for a new trial based on objected-to or unobjected-to improper arguments for an abuse of discretion. <u>Murphy v. Int'l Robotic Sys. Inc.</u>, 766 So. 2d 1010, 1030-31 (Fla. 2000); <u>City of Orlando v. Pineiro</u>, 66 So. 3d 1064, 1067 (Fla. 5th DCA 2011). "If the issue of an opponent's improper argument has been properly preserved by objection and motion for mistrial, the trial court should grant a new trial if the argument was 'so highly prejudicial and inflammatory that it denied the opposing

_____

[4] We affirm, without discussion, the trial court's denial of Reynolds' motion for new trial on the basis of a "golden rule" violation.

9

party its right to a fair trial.'" Engle, 945 So. 2d at 1271 (quoting Tanner v. Beck, 907 So. 2d 1190, 1196 (Fla. 3d DCA 2005)).[5]

Because "[c]ontext is crucial" in "determin[ing] whether the challenged statements and arguments were in fact prejudicial," we must provide a contextual backdrop to the comments Reynolds claims warrant a new trial. See Engle, 945 So. 2d at 1272 ("[T]he statements cannot be evaluated in isolation but must be placed and evaluated in context.").

We begin with the Florida Supreme Court decision in Engle. In Engle, the Florida Supreme Court held that the class-action lawsuit filed against tobacco companies and tobacco industry organizations by smokers and their survivors could not proceed as a class-action lawsuit on the issues of individual causation and apportionment of damages; however, the Engle Court held that certain findings on common liability would stand and would be given res judicata effect in subsequently filed individual cases if a plaintiff could establish class membership. Engle, 945 So. 2d at 1254-56.

The approved findings that stand include findings regarding the general health effects of smoking, namely "that smoking cigarettes causes" certain named

---

[5] Reynolds did not make contemporaneous objections to all of the comments it now claims were improper, nor did Reynolds timely move for mistrial when the objections it did make were sustained. However, we review Reynolds' claim of improper comments as though it was properly preserved because the parties entered into a pre-trial stipulation whereby both parties agreed they would not raise waiver of objections on appeal.

10

diseases, including bladder cancer, and "that nicotine in cigarettes is addictive." Id. at 1276-77. The approved findings also include common liability findings that the Engle defendants "concealed or omitted," and "agreed to conceal or omit," material information not otherwise known or available concerning the health effects and/or addictive nature of smoking cigarettes with the intention that the public would detrimentally rely on the information. Id. at 1277.

Turning to the instant case, during its opening statement, and again during its closing argument, Reynolds informed the jury that it was not disputing any of the Engle findings.[6] Yet, shortly after making these pronouncements, Reynolds denied the existence of a conspiracy to conceal—the fifth Engle finding.[7]

---

[6] In Reynolds' opening statement, counsel told the jury: "Now you heard [plaintiffs' counsel] talk about the [Engle] findings. We don't dispute that the findings apply to this case."

And, in its closing argument, Reynolds reminded the jury:

> Now I want to talk to you about these [Engle] findings that you've heard something about. Remember . . . [my law partner] when she spoke to you in opening and when I spoke to you during voir dire, I told you nobody from Reynolds is going to come in and make any objection or disagreement or anything about those findings . . . . [A]s to the findings, I told you and it's come true, nobody on our side has contested those findings.

[7] In its opening statement, Reynolds addressed the jury:

> [Plaintiffs' counsel] talked about a meeting that the tobacco companies had and intimated that it was a secret meeting, there was some conspiracy that all the tobacco companies were getting together for a purpose.

11

But what he [plaintiffs' counsel] didn't tell you was that the United States Attorney General was invited to that meeting. He was invited to attend, and he was sent documents about that very meeting. It wasn't confidential. The results of the meeting were published in the *New York Times*.

The CTR [Council for Tobacco Research], another example that [plaintiffs' counsel] discussed where he said it was a front organization, and he used those words. What he didn't tell you was the CTR funded millions of dollars in scientific research. They conducted thousands of studies. They were published, the results of those studies were published in leading journals at Harvard, Yale, here at the University of Miami, at the University of Florida. A number of the scientists that came out of the CTR received Nobel prizes. So this was hardly a front organization for the tobacco companies.

And during its closing argument, Reynolds told the jury:

Let's talk about the Plaza meeting.

The Plaza meeting, they [the tobacco industry] invited the attorney general of the United States to come to that meeting. They sent him papers about it before . . . . and they said we'll talk to you and then it was reported in the *New York Times*. Hardly a way to start a secret conspiracy.

And by the way, when counsel kept talking about these agreements, conspiracies and so forth, the only thing he pointed out to you that these companies did together was that meeting, and that wasn't a secret, and that wasn't a conspiracy.

. . . .

You have to decide if these companies did something jointly to harm Mr. Ballard, and the answer is, number one, they didn't show you anything jointly except going to this one meeting, and they didn't show it was related to Mr. Ballard.

. . . .

[Plaintiffs' counsel] told you that [CTR] was a front organization. Well, you know now what the facts are, ladies and gentlemen.

. . . .

The CTR funded – awarded $3 million to fund scientific research throughout the country. Did they bring a single witness in

civil conspiracy-concealment claim in post-Engle actions, i.e., that Reynolds agreed to conceal or omit information regarding the health effects of cigarettes and/or their addictive nature with the intention that smokers and the public would rely on this information to their detriment. Engle, 945 So. 2d at 1277; Brown, 70 So. 3d at 710.

"Engle defendants are precluded from arguing in individual actions that they did not engage in conduct sufficient to subject them to liability." Phillip Morris

here to say that he was pressured or told what to find? If that happened, they would have brought in a study, they would have shown you some evidence of that.

Didn't happen. We funded 250 scientists at 200 institutions, University of Miami, University of Florida, Harvard, Yale, all over the country. There were 7,000 published scientific or medical articles, and many of these people were funded by the tobacco CTR and the government. They worked with us on that.

To suggest it's a front organization is belied by the facts.

. . . .

It [a Reynolds' company document titled "Survey of Cancer Research with Emphasis Upon Possible Carcinogens from Tobacco," dated February 2, 1953] wasn't anything secret to Reynolds. [Plaintiffs' counsel] suggested to you that that was some secret work we did, and they're doing that with all of these documents. They're showing you a little bit, and they're misrepresenting them.

. . . .

And finally, I want to talk to you about the verdict form.

. . .

[A]nd finally was there a concealment – I'm sorry, was there a conspiracy[?] The only time that there – the only document that where people met was at the Plaza, and that wasn't a secret conspiratorial meeting because they invited the government, and then you saw the things, the Frank Statement and the things that came after that that established what companies actually did.

13

USA, Inc. v. Douglas, 110 So. 3d 419, 432-33 (Fla. 2013). Thus, when, as here, an Engle defendant challenges any of the Engle Phase 1 findings, it is not reversible error for plaintiffs' counsel to rebut such arguments in closing and rebuttal arguments.[8,9]

### III.   Conclusion

Because we find that sufficient evidence existed for the jury to conclude that Mr. Ballard was addicted to Reynolds' cigarettes containing nicotine, and that this addiction was the legal cause of his bladder cancer, the trial court properly denied Reynolds' motion for a directed verdict on class membership.

Additionally, because we find that the comments made by plaintiffs' counsel in closing and rebuttal arguments did not deny Reynolds its right to a fair trial, the trial court did not abuse its discretion in denying Reynolds' motion for a new trial.

Affirmed.

---

[8] We remind the parties that "in post-Engle actions the focus should be on the individualized issues of legal causation, comparative fault, and damages, and not on relitigating the conduct elements of the claims . . . ." Brown, 70 So. 3d at 718.

[9] While we caution against the use of any arguments that suggest the conduct of the defense at trial is a continuation of the underlying wrongdoing at issue in the lawsuit, we cannot conclude that the arguments made by plaintiffs' counsel in this case, when viewed in the totality of the circumstances, rise to the level of cumulative prejudice necessary to vitiate the fairness of this trial.