WINOKUR, J.
This case concerns the boundaries of proper closing argument. Plaintiffs counsel crossed those boundaries repeatedly, flagrantly, and often in defiance of the trial court’s admonishments. The depth and pervasiveness of these improper arguments compel reversal of this case for new trial.[1]
I.
Cynthia Robinson, as Personal Representative of the Estate of Michael Johnson, Sr., brought action against R.J. Reynolds Tobacco Company (“Reynolds”), seeking damages on the ground that Johnson’s death was the result of lung cancer caused by addiction to cigarettes manufactured and distributed by Reynolds. Before trial, Reynolds filed a motion in limine seeking to preclude argument or comment disparaging Reynolds for defending itself or failing to “take responsibility” or “apologize” to the plaintiff. The trial court granted Reynolds’ motion in limine in part, ordering counsel for Robinson not to “disparage Reynolds for defending itself in litigation” nor to “suggest that Reynolds should apologize to Plaintiff.”
The trial consisted of two phases. Lasting approximately three weeks, Phase I encompassed issues of Engle[2] class membership, liability, comparative fault, compensatory damages, and entitlement to punitive damages. Closing arguments ran three hours per side.
Beginning with a parable about a man named “Lie” who dressed himself in clothing stolen from a man named “Truth,” Robinson’s counsel used closing argument to characterize Reynolds’ defense as a scheme to deceive the jury, repeatedly comparing the company to a “drowning swimmer” willing to lie, cheat, and deceive to save itself. Robinson raised questions throughout closing argument about Reynolds’ failure to “accept responsibility,” at one point claiming that Reynolds was employing a strategy of deception modeled after the banking industry and suggesting one of Reynolds’ witnesses was part of a multi-corporation conspiracy to defraud the court system:
[Robinson’s counsel:] It kind of reminds me of the banking industry. The banking industry, toward the late ’90s, were making a lot of money.
[Reynolds’ counsel:] Objection, Your Honor. Improper argument.
[Robinson’s counsel:] May I respond, Your Honor?
[Court:] Finish your argument, Counsel.
[Robinson’s counsel:] The real estate. The real estate boom. Wall Street is doing well. Banks are doing well. And then the real estate bubble bursts. Now, Wall Street was driving that real estate bubble, banking was driving that real estate bubble, but the moment the bubble burst, who was to blame?
All the sudden, it was Middle America. Middle America for living beyond their means. Middle American, individual Americans for taking mortgages and buying houses that they knew they couldn’t afford in the first place, for being fiscally irresponsible, and now *678 they can’t make their bills. But who created the environment? The bankers, mortgage companies. And some of big banks even bet on the bust, so they made money on the bubble growing—
[Reynolds’ counsel:] Objection, Your Honor. This is irrelevant.
[Court:] Sustained. Move along, Counsel.
[Robinson’s counsel:] Why is that relevant, ladies and gentlemen? Because the same model works for tobacco. Why is it even more relevant? Because what did we see in the presentation of evidence? The same big corporations not only employ the same strategies, they employ the same people. Some of the experts—
[Reynolds’ counsel:] Objection, Your Honor. This is irrelevant.
[Robinson’s counsel:] May I make—
[Court:] Counsel, finish up.
[Robinson’s counsel:] We had an expert on the stand, Dr. Bennett, who said not only had he testified for tobacco in defense, he’d also testified for Ford in defense. He’d also testified for a pharmaceutical company in defense.
And he also said, what? In all of the cases he’s testified in trial at, not once has he ever found that the company, for whom he was testifying, was at fault. Which means what, by implication? That the person, the plaintiff who was suing, was at fault.
That’s exactly what the banking industry did. When the bubble burst because they—
[Reynolds’ counsel:] Objection, Your Honor. Improper argument.
[Court:] Sustained. Move along, Counsel.
[Robinson’s counsel:] So, ladies and gentlemen, sometimes we have to consider the environment that’s created. And then consider the options that are there for people. And then consider if a company is really changed. If from—if it’s really a new day. If they’re really accepting fault.
[Reynolds’ counsel:] Objection; same issue.
[Court:] Counsel. Keep moving.
[Robinson’s counsel:] If they’ve really turned over a new leaf, if accountability is ultimately what’s important, then why isn’t the corporation accepting responsibility. Why are they taking—
[Reynolds’ counsel:] Objection.
[Court:] Overruled.
Having set the stage, Robinson’s counsel castigated Reynolds for refusing to “come clean:”
The first thing I want to tell you, if we go to the first slide I’ve got, the tobacco companies, Reynolds and the others, they’ve never come clean about what we’ve proven in this trial. They never have.
RJR, that’s Reynolds, has never admitted—they’ve never admitted this. And you might remember Dr. Proctor was on the witness stand. He’s the guy from Stanford, the professor from Stanford, historian of science. He says millions—they have never admitted millions of people have died from smoking. They haven’t admitted that.
They have never admitted that they’re marketing targeted kids. They haven’t admitted that.
They’ve never admitted lying to the public.
They’ve never admitted making cigarettes more addictive....
[[Image here]]
They’ve never admitted that they assured smokers that smoking was safe....
[[Image here]]
*679 They’ve never admitted lying to the public, lying to congress. They’ve never admitted that.
They’ve never admitted that their filters and their low tar or light cigarettes are not safer.
[[Image here]]
But they refuse to this day to admit these things. They’re not a changed company. They’re the same old R.J. Reynolds that just thinks of an excuse and a way to continue to market its products—
The trial court overruled Reynolds’ objection to this line of comments.
Moments later, after proclaiming to the jury that tobacco is “one of the wealthiest, most powerful industries in this country,” and noting the “hundred billion on advertising” it has spent, Robinson’s counsel drew additional objections by accusing Reynolds of not admitting to “forming a conspiracy to hide the hazards of smoking” and “destroying documents to win lawsuits.” After arguing that Robinson’s claim that Reynolds engaged in spoliation was unsupported by the evidence, counsel for Reynolds argued that it was improper to argue that a defendant should be punished for not admitting fault:
And, frankly, Your Honor, this entire pitch about they didn’t accept responsibility or they didn’t do it is an improper argument. You cannot seek to punish a defendant for not admitting fault, and that’s exactly what they’re doing here.
Robinson’s counsel responded by clarifying that he was referring to Reynolds’ failure to admit its bad acts to the public, not the jury:
As far as them admitting these things, I’m not—I’m talking about to the public, and I thought I made that pretty clear that they’ve never admitted to the public that they do these things. And I think that that’s reprehensible.
The trial court overruled Reynolds’ objection, but told Robinson’s counsel to “crystallize” his argument.
Robinson’s counsel continued, “You might remember the last thing that Dr. Proctor testified about when I was asking him questions.... He talked about what this company and the other companies have refused to admit to the public. That’s what I’m talking about.”
Robinson’s counsel continued to develop the narrative that Reynolds’ defense and refusal to accept responsibility was part of a scheme to deceive the jurors, stating:
[Reynolds] could make a safer cigarette. Did they do it? No.
But they said, we got a good thing going here. We got [to] be able to snow the jurors. We’ve got a big legal team.
[[Image here]]
They are betting on the fact that they’re going to snow you. That’s what they’re betting on. They’re going to snow you either on the liability, or they’re going to snow you on the value of the loss to this young man, his father, and this lady, her husband....
The trial court sustained Reynolds’ objection to the first of these two comments, but Reynolds did not object to the second comment.
At the conclusion of Phase I of the trial, the jury found that the decedent was addicted to cigarettes containing nicotine, which was a legal cause of his lung cancer and death, and that smoking cigarettes manufactured by Reynolds was a legal cause of decedent’s lung cancer and death. The jury awarded approximately $9.59 million in non-economic compensatory damages to Michael Johnson, Jr., and approximately $7.3 million in such damages to Robinson, apportioning 70.5% of the fault *680 to Reynolds and 29.5% of the fault to the decedent.
Phase II of the trial, regarding punitive damages, lasted for one day. The jury returned an award of approximately $23.6 billion dollars ($23,623,718,906.62),
Reynolds filed a post-trial motion for judgment, new trial, or remittitur. Its primary argument was that the punitive award was so excessive as to warrant a new trial on all issues. Reynolds further argued, among other things, that the compensatory awards were excessive and that various improper arguments made by Robinson’s counsel warranted a new trial.
In response, Robinson conceded that the punitive award was excessive and “ought to be remitted.” But she contended that any broader relief would be inappropriate because that award arose entirely from comments made by Reynolds’ trial counsel during Phase II. She also contended that the compensatory awards were not excessive. And she contended that Reynolds had not preserved any challenge based on improper arguments.
The trial court agreed with the parties that the punitive award was “admittedly and clearly constitutionally excessive.” The court remitted that award to $16,893,833— the total combined amount of the two compensatory awards. Pursuant to Waste Management, Inc. v. Mora, 940 So.2d 1105 (Fla. 2006), the court gave either party the option to reject the remittitur and instead demand a new trial on the amount of punitive damages. Reynolds rejected the remit-titur and demanded a new trial on punitive damages, which the trial court granted.
The trial court denied any broader relief to Reynolds. In concluding that the compensatory awards were not excessive, the court acknowledged that they were “high compared to other Engle progeny verdicts that have been sustained on appeal.” However, the court stated that there was no jury passion during Phase I because the jury appeared “alert and attentive, calm, deliberate, focused, inquisitive, and insightful in nearly every question they asked.” The court further reasoned that Mr. Johnson “appears to have been the youngest Engle class member found to have died from a smoking related illness”; that the parties presented conflicting evidence; and that the jurors might have disbelieved medical expert testimony presented by Reynolds, which could have led them to reason “that if a critical defense expert was not reliable, then how could the Defendant’s other positions be relied upon.”
Reynolds appealed pursuant to Florida Rule of Appellate Procedure 9.130(a)(4) challenging the February 11, 2015 order insofar as it limited the grant of a new trial to the question of the punitive damages amount.
II.
Reynolds contends that numerous comments of Robinson’s counsel regarding its alleged failure to accept responsibility and admit wrongdoing improperly disparaged the company for defending itself at trial. Robinson counters that the comments were proper in that they related to her request for punitive damages. A trial court’s denial of a motion for new trial based on improper closing arguments is reviewed for abuse of discretion. R.J. Reynolds Tobacco Co. v. Gafney, 188 So.3d 53, 57 (Fla. 4th DCA 2016). “If the issue of an opponent’s improper argument has been properly preserved by objection and motion for mistrial, the trial court should grant a new trial if the argument was ‘so highly prejudicial and inflammatory that it denied the opposing party its right to a fair tri *681 al.’” Engle v. Liggett Grp., Inc., 945 So.2d 1246, 1271 (Fla. 2006) (quoting Tanner v. Beck, 907 So.2d 1190, 1196 (Fla. 3d DCA 2005)).
Litigants enjoy broad, but not unlimited, latitude during closing argument. As our supreme court explained in Murphy v. International Robotic Systems, Inc.:
The purpose of closing argument is to help the jury understand the issues in a case by “applying the evidence to the law applicable to the case.” Attorneys should be afforded great latitude in presenting closing argument, but they must “confíne their argument to the facts and evidence presented to the jury and all logical deductions from the facts and evidence.” Moreover, closing argument must not be used to “inflame the minds and passions of the jurors so that their verdict reflects an emotional response ... rather than the logical analysis of the evidence in light of the applicable law.
766 So.2d 1010, 1028 (Fla. 2000) (citations omitted).
A plaintiff may not suggest to the jury that a defendant is somehow acting improperly by defending itself at trial or that a defendant should be punished for contesting damages. See State Farm Mut. Auto Ins. Co. v. Thorne, 110 So.3d 66, 74-75 (Fla. 2d DCA 2013) (declaring improper plaintiffs “contention in closing that the defendants’ evidence and argument were an attempt ‘to avoid responsibility" and, as a result, the defendants exhibited shameful conduct”); Intramed, Inc. v. Guider, 93 So.3d 503, 507 (Fla. 4th DCA 2012) (“Counsel’s arguments improperly suggested that the defendant should be punished for contesting damages at trial and that its defense of the claim in court was improper[.]”); Carnival Corp. v. Pajares, 972 So.2d 973, 977-78 (Fla. 3d DCa 2007) (“The arguments made by Pajares’ counsel, denigrating Carnival’s defense of Pa-jares’ claim and suggesting that Carnival should be punished for contesting liability, are the type of arguments previously condemned by this Court, and are equally condemned in the instant case.”).
The Fourth District recently applied this principle in Cohen v. Philip Morris USA, Inc., 203 So.3d 942 (Fla. 4th DCA 2016), an Engle progeny case involving comments remarkably similar to the ones made in this case. There, as here, the plaintiff repeatedly claimed that the tobacco company failed to “take responsibility” and admit wrongdoing. Id. at 945. For example, the plaintiff maligned the tobacco company for “a dozen things tobacco has never admitted to,” such as never having “admitted that the cigarettes smoked today are just as deadly as any cigarettes ever smoked” and that “hundreds of thousands of people have died.” Id. at 946.
The Cohen court affirmed the trial court’s order granting a new trial based in part on these comments, reasoning that “counsel made arguments which crossed the line into ‘take responsibility’ and ‘apologize’ territory.” Id. at 948. The court rejected the plaintiffs argument that such comments were proper because they related to its request for punitive damages, explaining that the comments were not “clearly linked” to proving what is required for punitive damages, that is, that the defendant acted with intent or gross negligence. Id.
We agree that it is improper to disparage an Engle defendant for contesting what is in dispute at trial. In every Engle case there are certain factual findings that have res judicata effect. The jury is required to regard these findings as conclusively established. However, such plaintiff-specific issues as legal causation, *682 comparative fault, and damages must be proved on a jury-by-jury basis. See Philip Morris USA, Inc. v. Douglas, 110 So.3d 419, 424 (Fla. 2013). On these and other open issues of liability, Engle defendants are permitted to defend themselves vigorously. Plaintiffs may not denigrate defendants for contesting the very facts that they are, as plaintiffs, required by law to prove.
Here, Robinson’s comments are substantively identical to the comments condemned in Cohen. By reproaching Reynolds for its supposed failure to “come clean” and admit past wrongdoing, Robinson violated the principle that plaintiffs may not disparage defendants for contesting liability at trial. Reynolds was under no obligation to admit disputed facts helpful to Robinson’s case for punitive damages. Plaintiffs must carry their own burden, and to suggest otherwise is improper.
Similarly, we emphasize the manifest impropriety of Robinson’s suggestions that Reynolds was not “accepting responsibility.” Robinson made the extraordinary claim that Reynolds and other “big corporations” use legal defenses modeled after a dishonest strategy employed by the banking industry in the real estate market and that one of Reynolds’ witnesses was complicit in this scheme of deception. Such allegations of conspiracy do more to stir the imagination than encourage reasoned analysis of facts and evidence. As such, they are inappropriate.
The same tactic was recently used against Reynolds in R.J. Reynolds Tobacco Co. v. Gafney, 188 So.3d 53 (Fla. 4th DCA 2016). There, during closing argument, plaintiffs counsel suggested that Reynolds’ counsel was involved in a conspiracy, stating:
[I]f you wanted to have a window when the defendants, through the Tobacco Institute, were speaking privately, secretly among themselves, high-ranking officials of the Tobacco Institute, and want to know why the defense in these cases consistently tries to recast the jury instructions and the questions on the verdict form, you have information that helps you from one of their co-conspirators, and that’s the Tobacco Institute, and here it is.
Id. at 56 (emphasis in original). The Fourth District condemned the comment, stating, “[t]he insinuation that appellants’ attorneys were engaged in a conspiracy with either the defendants or third parties to mislead, conceal, or manipulate as part of an on-going scheme did not merely push the envelope, but instead went wholly beyond the pale.” Id. at 59.
The same is true here. Robinson’s allegation against Reynolds’ witness, which necessarily implicated Reynolds’ counsel, served no other purpose but to incite prejudice and undue suspicion. Again, the purpose of closing argument is to facilitate reasoned analysis of the facts and evidence, not to denigrate the opposing party with outlandish conspiracy theories.
III.
Again, Reynolds is entitled to a new trial if Robinson’s improper arguments were so highly prejudicial and inflammatory that they denied Reynolds its right to a fair trial.[3] It is clear from the *683 record that Robinson’s trial strategy was to utterly vilify their opponent. In addition to accusing opposing counsel of participation in a scheme of deception, counsel for Robinson denigrated Reynolds as an unrepentant,[4] anti-military,[5] criminal[6] predator,[7] whom the jury must fight[8] and destroy.[9],[10] The jury, perhaps heeding Robinson’s ominous warning that “God’s not pleased,”[11] answered with an unprecedented punitive verdict of $23.6 billion. On such a record, so replete with improper arguments and comments clearly intended to stir the passions of the jury, we must conclude that Robinson’s misconduct had its intended effect. Indeed, we regard the absurdly excessive punitive award as sure proof that the jury gave great weight to Robinson’s presentation. See Christopher v. Fla., 449 F.3d 1360, 1374 n.11 (11th Cir. 2006) (finding “the jury’s award of excessive damages as proof that Plaintiffs counsel’s misconduct probably influenced the jury”); Harbor Ins. Co. v. Miller, 487 So.2d 46, 47 (Fla. 3d DCA 1986) (finding that the excessiveness of the award was “evidence that the prejudicial conduct complained of by appellant was in fact so extensive that its influence pervaded the trial to the point that it was impossible for appellant to receive a fair trial”).
Our conclusion is reinforced by the absence of any meaningful effort on the part of the trial court to stop the wrongdoing, even when Robinson engaged in misconduct previously ruled improper. For example, during closing argument, the trial court sustained an objection to a remark accusing Reynolds of having one of its medical experts “come in from Montana *684 and throw every Pensacola doctor under the bus.” Later, Robinson’s counsel made the same comment, stating, “they paid Dr. Bennett to come all the way from Montana and throw out not only Dr. Boatright but every other Pensacola doctor under the bus.” Reynolds objected, and the trial court merely asked Robinson’s counsel to “rephrase” the comment. This and other instructions such as “move along” or “finish up” likely aggravated the harm and may have encouraged future misconduct. The Fourth District recently addressed similar improper argument and consequent lack of assertive response by the trial court in R.J. Reynolds Tobacco Co. v. Calloway, 201 So.3d 753, 762 (Fla. 4th DCA 2016) (en banc):
[T]he record reflects no significant admonishment of any kind was delivered by the court, even after plaintiffs counsel chose to continue with similar improper comments when defendants’ objections had been sustained. The repeated sustained objections should have been sufficient to alert the court to the impermissible nature of these comments. Advising counsel to simply “move on” to another line of questioning was wholly inadequate. As a result, the prejudicial effect of these comments was compounded by the trial court’s failure to attempt any real intervention to curb them.
We agree. Where, as here, a litigant repeatedly ignores court rulings and exhibits flagrant disregard for the bounds of proper argument, it is not enough to simply sustain objections and offer flaccid admonishments such as “move along” or “finish up.” The trial court should clearly convey to counsel that misconduct will not be tolerated, even in the presence of the jury if necessary. See Gomez v. State, 751 So.2d 630, 633 (Fla. 3d DCA 1999). Because this did not occur here, in spite of counsel’s myriad improper and inflammatory comments, Reynolds was denied a fair trial.
IV.
For the foregoing reasons, we hold that the trial court erred in denying Reynolds’ motion for new trial. We reverse and remand for a new trial.
B.L. THOMAS and JAY, JJ., CONCUR.

. Because we reverse this case for a new trial, we decline to address the other issues raised by Appellant.

. Engle v. Liggett Grp., Inc., 945 So.2d 1246 (Fla. 2006).

. We reject Reynolds’ argument that it is entitled to a new trial because Robinson "cannot prove that her trial counsel's improper arguments were harmless.” "Error,” in the context of harmless-error analysis, is an improper ruling by the trial court, not an improper comment by counsel or a witness. For example, in the case Reynolds cites for this proposition, Special v. West Boca Medical Center, 160 So.3d 1251 (Fla. 2014), the trial court improperly excluded evidence, and the supreme court undertook to determine whether *683 the trial court’s errors were harmless. While the trial court here did erroneously overrule some of Reynolds’ objections, it sustained most of them and, therefore, did not commit "errors” that Robinson must prove are harmless. See e.g., Poole v. State, 997 So.2d 382, 391 n.3 (Fla. 2008). The "error” alleged here is the denial of the motion for new trial based upon these comments. Because we find that the comments deprived Reynolds of a fair trial, the trial court erred in denying Reynolds' motion. "Harmless error” plays no part in this analysis.

. "And now they come in and woe us down as if they're repenting, but they’re not. They’re not because the first thing of repenting is what? Admission. They haven't accepted any liability. They couldn't make it in any church with this argument."

. "You won't believe this. After (U.S. soldiers] got back home—first, these tobacco companies gave cigarettes free. Free. They put a pack of cigarettes in breakfast, they put one in lunch, and they put one in dinner. They gave it to them free. They thought it was free. They knew they were getting them hooked on drugs.”

. "[M]ost people don’t get to sell drugs without going to jail.”

. “They got the money, they got the resources, they got the power, they can fight, and they’re fighting.”

. "We got ambushed, some of our boys got ambushed on Sunday morning [referring to the 1941 attack on Pearl Harbor]. And you know that story. I won't go into that, but they were fighting for us, and you’ve got to fight for them.”

. "You have a lot of power members of the jury ... [y]ou can bring major corporations to their knees when you catch them wrong a billion people going down."

. To be sure, Reynolds’ counsel did not object to all of these comments. While we would not reverse the order denying new trial based upon these unobjected-to comments, the cumulative effect of preserved and unpreserved improper comments may be considered. See e.g., Allstate Ins. Co. v. Marotta, 125 So.3d 956, 961 (Fla. 4th DCA 2013).

. “But when you withhold, when you refrain from telling the truth, and you flat out lie to people to get them hooked so you can make more money, that’s not right, and you know it’s not right. Nobody’s pleased with that. God’s not pleased with that.”