# Third District Court of Appeal

## State of Florida

Opinion filed March 27, 2024.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D21-2214
Lower Tribunal No. 17-18509
_____

## Philip Morris USA Inc.,
Appellant,

vs.

## Michael Jordan Lipp, etc.,
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Peter R. Lopez, Judge.

Arnold & Porter Kaye Scholer LLP, and David M. Menichetti (Washington, DC); Shook, Hardy & Bacon L.L.P., and Michael Rayfield and Scott A. Chesin (New York, NY), for appellant.

The Alvarez Law Firm, and Alex Alvarez, Michael Alvarez, Nicholas Reyes and Philip Holden; David J. Sales, P.A., and David J. Sales (Sarasota), for appellee.

Before EMAS, GORDO and BOKOR, JJ.

BOKOR, J.

In this Engle[1] progeny case, Philip Morris USA, Inc. ("PM USA") appeals from a final judgment entered in favor of Michael Jordan Lipp, as personal representative of the Estate of Norma K. Lipp, following a jury trial. We find merit in PM USA's argument that the trial court erred in admitting harmful hearsay statements. And we conclude that the beneficiary of these improper statements can't prove that the error didn't contribute to the verdict. Accordingly, we reverse.

**BACKGROUND**

For decades, Mrs. Lipp smoked filtered cigarettes, sometimes more than a pack per day. In 1992, Mrs. Lipp was diagnosed with lung cancer. She passed away the following year. In 2007, Mrs. Lipp's son filed the instant wrongful death lawsuit against PM USA on behalf of his mother's estate, asserting claims of strict liability, negligence, fraudulent concealment, and conspiracy to conceal. The case went to trial in March 2020, but the trial court declared a mistrial because of the COVID-19 pandemic. The case was retried in August 2021.

---

[1] Engle v. Liggett Grp., Inc., 945 So. 2d 1246 (Fla. 2006)

At trial, the plaintiff called Mrs. Lipp's sons, A.J. and Michael, as witnesses. In relaying a conversation with his mother, A.J. testified:

Q. After she had her lung removed, okay, did she ever express to you that she was upset?

A. Yeah.

Defense counsel: Objection. Hearsay.

. . . .

Court: Overruled.

Q. Did she express it to you after her lung was removed?

Court: Overruled.

A. Okay. Yeah. After her surgery, she was very upset at the tobacco companies specifically.

Defense Counsel: Objection. Hearsay.

Court: Overruled.

A. *Because she was upset at the tobacco companies because they told her that filtered cigarettes – that filters would filter out the bad stuff and keep her safe* and she knew once she got lung cancer and had her lung removed that the filter didn't keep her safe and didn't filter out the bad stuff.

(emphasis added).

Michael also provided the following testimony:

Q. Now, I want to ask you about another conversation you had with your mom. After she was diagnosed with lung cancer, did you ever have a conversation with your mom where she appeared angry to you?

A. Yes.

Q. Okay. Did she tell you at that time why she was feeling angry?

3

Defense counsel: Objection.  Hearsay.

Court: Overruled.

A. So we talked about the trip to California.  So we took that trip.

Q. Was this the last vacation the family took with her?

A. Yeah.  It was — my mom kind of wanted to go on a last trip as a family.  But I didn't know it was the last trip.  She knew that.  And, you know, my brother, sister, my dad was around.  There was kind of — we were kind of in — I think it's the hotel room, just the two of us.  We don't get that much alone time.  And we talked, and she was angry.  And she was angry she was dying.  She was angry at the tobacco companies.

Q. Did she tell you why she was angry at the tobacco companies?

A. She said, *"They lied to me."*  She said—

Defense counsel: Objection.  Hearsay.

Court: Overruled.

A. So she was mad that she was dying.  She said, "*Cigarette companies lied to me*.  I wish I'd never smoked."  And then she made me promise that I would never smoke.

(emphasis added).  The plaintiff's counsel later highlighted the above statements during closing arguments, telling the jury: "She was angry when she found out that she was lied to.  She believed them, that filters were going to keep her safe, that it was safer."  The jury returned a verdict in favor of the Estate and against PM USA, awarding the former a total of $43 million in damages—$15 million in compensatory damages and $28 million in punitive damages.  After the trial court denied all of PM USA's post-trial motions, this appeal followed.

4

## ANALYSIS

On appeal, PM USA contends, among other things, that the trial court erred in allowing inadmissible hearsay statements to be introduced. PM USA maintains that Mrs. Lipp's statements, presented through A.J. and Michael's testimonies, were backward-looking and not offered for the purpose of showing Mrs. Lipp's state of mind at the time of the conversation. We agree.

We review the trial court's rulings on the admissibility of evidence for an abuse of discretion, but the question of whether a statement is hearsay is reviewed de novo. Cannon v. State, 180 So. 3d 1023, 1037 (Fla. 2015). A hearsay statement is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." § 90.801(1)(b), Fla. Stat. "However, the same statement may be admissible to prove a variety of issues besides the truth of the matter, such as the declarant's state of mind." Everett v. State, 801 So. 2d 189, 191 (Fla. 4th DCA 2001). A declarant's state of mind is defined as follows:

> (a) A statement of the declarant's then-existing state of mind, emotion, or physical sensation, including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health, when such evidence is offered to:
> 1. Prove the declarant's state of mind, emotion, or physical sensation at that time or any other time when such state is an issue in the action.

5

2. Prove or explain acts of subsequent conduct of the declarant.

§ 90.803(3)(a), Fla. Stat. In essence, "statements of the declarant's then-existing state of mind are admissible to prove or explain the declarant's subsequent conduct or to prove the declarant's state of mind at the time that the statement was made or at any other time, but only when such a state is an issue in the action." Lorillard Tobacco Co. v. Alexander, 123 So. 3d 67, 75 (Fla. 3d DCA 2013). However, an exception applies for after-the-fact statements. See § 90.803(3)(b)(1), Fla. Stat. ("[T]his subsection does not make admissible . . . [a]n after-the-fact statement of memory or belief to prove the fact remembered or believed . . . ."). In other words, "a hearsay statement which recounts 'observations made previously' is by definition an 'after-the fact statement of memory' and expressly excluded from the state of mind exception." R.J. Reynolds Tobacco Co. v. Hamilton, 316 So. 3d 338, 342 (Fla. 4th DCA 2021) (quoting in part § 90.803(3)(b)(1), Fla. Stat.). So, the question becomes, do Mrs. Lipp's statements constitute state of mind, or after-the-fact statements of memory, used to show that Mrs. Lipp relied on the statements from the tobacco companies, and not another source?

In the underlying proceedings, the trial court permitted A.J. to testify, over contemporaneous objection, that, after Mrs. Lipp's lung was removed, she recollected that the tobacco companies represented to her that filtered

6

cigarettes would "filter out the bad stuff and keep her safe." It further permitted Michael to testify over objection that, after his mother was diagnosed with lung cancer in 1992, she told him that the cigarette companies had previously lied to her. On appeal, PM USA properly distinguishes Alexander, 123 So. 3d 67, from the instant case. There, the decedent's wife testified that she tried to persuade the decedent to stop smoking, and up until 1985, the decedent told her he believed filtered cigarettes were safe and that he did not believe the tobacco companies would make a product that would kill people. Id. at 71. As the court concluded in Alexander, those statements were not only material to the key issue in the case concerning the decedent's reliance on the tobacco industry, but also conveyed his subjective beliefs, which "were offered to prove his subsequent conduct and to explain his continued conduct of smoking." Id. at 75; see also Philip Morris USA Inc. v. Holliman, 374 So. 3d 87, 93 n.9 (Fla. 3d DCA 2022) ("Holliman's out-of-court statement that 'cigarettes was [sic] not bad for you' was admissible because it was offered to show Holliman's material state of mind—his belief that smoking was not bad for him—and not to prove that cigarettes were, indeed, not bad for health."). Hamilton, 316 So. 3d 338, another case on which PM USA relies, is instructive. There, the decedent's statement to her son that she believed filtered cigarettes were

7

safe, because of tobacco companies' advertising, was not admissible under the state of mind exception. Id. at 340–42. Our sister court concluded that said portion of the smoker's statement didn't disclose anything about her state of mind. Instead, "it simply stated a fact: [the decedent] previously heard filtered cigarettes were safe from advertising and not from some other source." Id. at 341. Thus, here, while Mrs. Lipp being mad may have been a state of mind, the statement wasn't offered for that purpose. The purpose was to show that the tobacco companies, and not some other source, lied to Mrs. Lipp and that she relied on that lie to continue smoking. Accordingly, like in Hamilton, the statement was offered to prove an issue in the case, namely, that Mrs. Lipp relied on the tobacco companies' lies to her detriment.

Unlike Alexander and Holliman, where the statements were offered to explain the decedents' beliefs for their continued smoking, here the statements weren't offered to establish why Mrs. Lipp currently smoked filtered cigarettes or her reasoning in continuing to do so. Rather, the statements were "after-the fact statements of why [Mrs. Lipp] smoked in the past." Alexander, 123 So. 3d at 75. In other words, Mrs. Lipp's statements weren't statements that explained her existing state of mind or subsequent conduct, but statements about beliefs she no longer held concerning alleged lies, which were told to her in the past. Further, and like Hamilton, Mrs. Lipp's

8

statements were offered to reinforce that the tobacco companies lied to her in the past.[2]

Next, we examine whether the erroneous hearsay statements constituted harmless error. "Errors in evidentiary rulings in civil cases are subject to harmless error analysis." Hamilton, 316 So. 3d at 342. "To test for harmless error, the beneficiary of the error has the burden to prove that

---

[2] Hamilton explains that the simple fact that the statement may contain a portion of admissible, state-of-mind testimony doesn't change its overall character:

> Plaintiff also argues that the statement was admissible because "most states of mind are going to be based on knowledge gained and observations made previously." However, a hearsay statement which recounts "observations made previously" is by definition an "after-the fact statement of memory" and expressly excluded from the state of mind exception. § 90.803(3)(b) 1., Fla. Stat. What Plaintiff is attempting to do is "piggyback" an otherwise inadmissible backward-looking statement onto an admissible statement. Doing so, however, both ignores and undermines the rule against hearsay. See Shepard v. United States, 290 U.S. 96, 105–06, 54 S.Ct. 22, 78 L.Ed. 196 (1933) (noting that if the distinction between forward looking statements and backward looking statements is ignored, "[t]here would be an end, or nearly that, to the rule against hearsay"); Reed v. State, 438 So. 2d 169, 172 (Fla. 1st DCA 1983) (Ervin, C.J., specially concurring) ("The reason for excluding after-the-fact statements of memory is that '[i]f these statements were admitted it would be easy for any individual to manufacture evidence to prove facts that had occurred in the past.' " (quoting Charles W. Ehrhardt, 1 Fla. Prac., Evidence § 803.3B (1977))).

Hamilton, 316 So. 3d at 342.

9

the error complained of did not contribute to the verdict." Special v. W. Boca Med. Ctr., 160 So. 3d 1251, 1256 (Fla. 2014). "[T]he court's obligation is to focus on the effect of the error on the trier-of-fact and avoid engaging in an analysis that looks only to the result in order to determine harmless error." Mesa v. Citizens Prop. Ins. Corp., 358 So. 3d 452, 457 (Fla. 3d DCA 2023) (quoting Special, 160 So. 3d at 1256).

Here, the central theory to the plaintiff's case was that tobacco companies deceived Mrs. Lipp into believing that smoking filtered cigarettes was safer than smoking non-filtered cigarettes. The plaintiff advanced this theory through the testimonies of Mrs. Lipp's two sons, and primarily through Mrs. Lipp's hearsay statement that the tobacco companies lied to her. The centrality of this hearsay statement to the plaintiff's case was further re-iterated during closing arguments: "She was angry when she found out that she was lied to. She believed them, that filters were going to keep her safe, that it was safer." Considering the inadmissible hearsay statements from both testimonies and the re-introduction of Mrs. Lipp's statements during closing argument, we cannot conclude that the error didn't contribute to the verdict. See Hamilton, 316 So. 3d at 342–43 ("[C]onsidering the strong evidentiary value of Mrs. Hamilton's statement, it cannot be said there is no reasonable possibility that the error contributed to the verdict."). For the

10

foregoing reasons, we hold that the trial court reversibly erred in admitting the inadmissible hearsay statements.[3]  We therefore reverse and remand for a new trial.

Reversed and remanded.

GORDO, J. concurs.

---

[3] Because we conclude that the hearsay statements provide a basis for reversal and new trial, we need not address the additional issues of jury selection and the punitive damages award.

GORDO, J., concurring.

The right to a fair and impartial jury trial is fundamental to our constitutional republic. Appellate courts have a duty to preserve inviolate this right and respect the jury's verdict—so long as it is rightfully rendered. See Shoma Coral Gables, LLC v. Gables Inv. Holdings, LLC, 48 Fla. L. Weekly D1454 (Fla. 3d DCA July 26, 2023) (Gordo, J., concurring) ("In Florida, where cases are properly submitted to a jury for a determination of competing facts—judges do not—and cannot, act as the seventh juror and override that finding unless no proper view of the evidence could sustain the jury's verdict."); Salazar v. Gomez, 317 So. 3d 170, 174 (Fla. 3d DCA 2021) ("[W]here the court heard no new evidence other than what was known prior to trial and presented to the jury, where the moving party sought no relief prior to or during trial and where the alleged inconsistencies were subject to impeachment, cross-examination and jury deliberation, we are constrained to conclude the trial court abused its discretion in overturning the verdict and dismissing the case.").

But here, the impact of the inadmissible hearsay statements on *this* verdict cannot be ignored. The plaintiff built his case around the claim that the defendant deceived Mrs. Lipp into believing that filtered cigarettes were

12

safer, and he was able to advance this theory not through a "snippet" of cumulative testimony as the dissent posits, but through lengthy and highly prejudicial inadmissible hearsay statements made by two separate witnesses—Mrs. Lipp's sons. Knowing that this testimony could evoke sympathy in the minds of the jurors, experienced trial lawyers used these improper and highly prejudicial statements to paint a detailed picture—one that graphically illustrated two independent, emotional conversations between a dying mother and her loving sons. Each of these conversations took place in a tragic setting—one after the devastating removal of Mrs. Lipp's lung, the other on what would be the family's final trip together. The latter exchange, set in the hotel room on this fateful vacation, spotlighted some of the last shared moments between the plaintiff and his mother. These same lawyers later highlighted this inflammatory testimony during closing argument, specifically emphasizing Mrs. Lipp's indignant anger and blame towards the defendant. While the dissent makes a valiant attempt to minimize the improper hearsay to a "few lines of testimony" and "one sentence" during closing argument, it is inescapable that this testimony—and the harmful mental images it created—became a focus of the trial and was clearly and repeatedly used by counsel to inflame the jury. See R.J. Reynolds Tobacco Co. v. Robinson, 216 So. 3d 674, 683 (Fla. 1st DCA

13

2017) (reversing for a new trial "[o]n such a record, so replete with improper arguments and comments clearly intended to stir the passions of the jury"). But see Nolley v. State, 237 So. 3d 469, 476 (Fla. 1st DCA 2018) (finding the error did not rise to the level of fundamental error because "[t]he erroneous testimony was brief" and "did not become the focus of the trial").

Our caselaw is clear that where there is error, the proponent of the error must dispel all notions that the error contributed to the verdict. See Special v. W. Boca Med. Ctr., 160 So. 3d 1251, 1256 (Fla. 2014) ("To test for harmless error, the beneficiary of the error has the burden to prove that the error complained of did not contribute to the verdict. Alternatively stated, the beneficiary of the error must prove that there is no reasonable possibility that the error contributed to the verdict."). It is clear to me from the tone and tenor of this improper testimony, the impassioned closing argument and this verdict being the largest ever awarded in any similar tobacco case in the country—that the plaintiff has not carried his burden of proving that this error did not contribute to the verdict. See Samuels v. Torres, 29 So. 3d 1193, 1196 (Fla. 5th DCA 2010) ("No citation of authority is necessary for the well-established principle that **all parties** are entitled to a fair trial. To that end, the law imposes upon a jury the duty to impartially determine the facts and decide the issues in each case based on the evidence presented and the

14

applicable law.  Fidelity to that duty prohibits a jury from being swayed by sympathy for any party when rendering its verdict.  A soft heart infused with pity proclaims sympathy, not facts based on evidence, and there are no rules of law that guide its direction.") (footnote omitted) (emphasis added); Murphy v. Int'l Robotic Sys., Inc., 766 So. 2d 1010, 1028 (Fla. 2000) (recognizing the prejudicial effect of statements that "inflame the minds and passions of the jurors" (quoting Bertolotti v. State, 476 So. 2d 130, 134 (Fla. 1985))); Chambers v. State, 924 So. 2d 975, 978-79 (Fla. 2d DCA 2006) (recognizing that inflammatory statements that invoked the "sympathy or anger of the jury" may have improperly "influenced the jury to reach a more severe verdict than it would have otherwise rendered").

While the consequence is unfortunate, parties proceed at their own peril when they choose to overstep and inject sympathy and prejudice into the minds of jurors, particularly in a case where legitimate and obvious sentiments may already exist.  See R.J. Reynolds Tobacco Co. v. Calloway, 201 So. 3d 753, 765 (Fla. 4th DCA 2016) (cautioning counsel to be vigilant in crafting arguments that fall within the confines of permissibility and stating that "[a]ttorneys who engage in such [improper] tactics in the future do so at their own peril, and the peril of their clients, by risking the reversal of their cases on appeal").

EMAS, J., dissenting.

Although I agree with the majority's determination that a portion of Michael and A.J. Lipp's testimony regarding statements made by their mother may have constituted hearsay, see Maj. Op. at *8, I dissent because this snippet of testimony was cumulative to other, substantial and admissible testimony introduced on the exact same issue. There is no reasonable possibility that the hearsay testimony contributed to the jury's verdict, and thus any error in its admission was harmless beyond a reasonable doubt. Accordingly, we must affirm.

**The Harmless Error Test**

The jury's verdict in a civil action should be affirmed on appeal where the admission of testimony, though erroneous, constitutes harmless error. Special v. W. Boca Med. Ctr., 160 So. 3d 1251 (Fla. 2014). Although the harmless error test was first applied only to criminal appeals, see State v. DiGuilio, 491 So. 2d 1129, 1139 (Fla. 1986) (applying the harmless error rule to affirm a criminal conviction for conspiracy to traffic in cocaine, notwithstanding the prosecution's improper questioning and elicitation of testimony regarding the defendant's invocation of his right to remain silent

during police questioning), the Florida Supreme Court in 2014 adopted the

DiGuilio harmless error test for civil appeals as well:

> Although the test for harmless error as stated in *DiGuilio* applies to criminal appeals, we conclude that this test, with slight modification to accommodate the civil context, is also the appropriate test for harmless error in civil appeals. Thus, today, we announce the following test for determining harmless error in civil appeals:
>
>> To test for harmless error, the beneficiary of the error has the burden to prove that the error complained of did not contribute to the verdict. Alternatively stated, the beneficiary of the error must prove that there is no reasonable possibility that the error contributed to the verdict.

Special, 160 So. 3d at 1256.

The harmless error test generally applies even to errors of a

constitutional magnitude,[4] and in the criminal context the test is intended to

"preserve[] the accused's constitutional right to a fair trial by requiring the

state to show beyond a reasonable doubt that the specific comment(s) did

---

[4] See, e.g., State v. DiGuilio, 491 So. 2d 1129, 1134 (Fla. 1986) (noting that "constitutional errors, with rare exceptions, are subject to harmless error analysis," and applying the harmless error rule to affirm a criminal conviction for conspiracy to traffic in cocaine, notwithstanding the prosecution's improper questioning and elicitation of testimony regarding the defendant's invocation of his right to remain silent during police questioning); Goodwin v. State, 751 So. 2d 537, 540 (Fla. 1999) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.") (quoting Chapman v. California, 386 U.S. 18, 24 (1967)).

not contribute to the verdict. At the same time, it preserves the public and state interest in finality of verdicts which are free of any harmful error." DiGuilio, 491 So. 2d at 1136. The same can be said when applying the harmless error rule on appellate review of verdicts in civil cases. As the Court noted in Special, 160 So. 3d at 1257:

> The no reasonable possibility test also strikes the appropriate balance between the need for finality and the integrity of the judicial process. The test recognizes that not all errors have a reasonable possibility of contributing to the verdict, but the test affords relief on account of errors that do. Further, the application of the no reasonable possibility test for harmless error will foster consistency in appellate courts' analyses of harmless error.

**Factors to Consider in Assessing Harmless Error**

In applying the harmless error test, we must consider the entire record, not in a vacuum, but in the context in which the testimony was introduced. We must also consider whether the erroneously admitted testimony is cumulative to other evidence properly presented, and the relevance of the erroneously admitted testimony to the disputed issues at trial. See, e.g., Special, 160 So. 3d at 1256 ("[A]pplication of [this] test requires an examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the

impermissible evidence which might have possibly influenced the jury verdict.") (quoting DiGuilio, 491 So. 2d at 1135).

As applied to the instant case, it is clear that the erroneously admitted evidence is merely cumulative to the other substantial and admissible testimony introduced at trial on the same question, and could not reasonably have had any impact on the disputed issues at trial. Under such circumstances, we must affirm. See, e.g., Sutton v. State, 909 So. 2d 292 (Fla. 3d DCA 2004) (affirming murder conviction and holding that trial court's errors—admitting hearsay testimony regarding defendant's change in appearance shortly following the murder, and then permitting prosecutor to argue in closing that this improper testimony evidenced defendant's consciousness of guilt—was harmless error, in light of the fact it was cumulative to other testimony regarding defendant's change in appearance, other evidence of consciousness of guilt, and given that defendant's main defense was alibi); Andrews v. Tew By and Through Tew, 512 So. 2d 276 (Fla. 2d DCA 1987) (reversing order granting new trial, and holding that, even if admission of the expert's testimony was error, the error was harmless given that it was "merely cumulative" of other testimony presented during the trial); Rodgers v. State, 948 So. 2d 655 (Fla. 2006) (affirming sentence of death for first-degree murder, and holding that trial court's violation of defendant's

constitutional right of confrontation under <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), was harmless, given that the evidence erroneously admitted was merely cumulative to, and corroborative of, other evidence admitted at trial); <u>Kaczmar v. State</u>, 104 So. 3d 990 (Fla. 2012) (affirming first-degree murder conviction and sentence of death, and holding that violation of spousal privilege—by which trial court permitted defendant's wife to testify to communications in which the defendant asked her to get $300 to use in framing defendant's friend for the murder—was harmless beyond a reasonable doubt because this improperly admitted testimony was merely cumulative to other admissible testimony by the wife, relating to her own actions as opposed to communications with the defendant).

### The *Engle* Findings, the Stipulated Facts, and the Evidence Presented on the Issues in Dispute

It is worth noting that the trial in this case lasted more than two weeks, resulting in a transcript of more than 3,600 pages.[5] In addition, once it was established that Norma Lipp was a member of the <u>Engle</u> class,[6] Plaintiff was

---

[5] In fact, this trial was the second trial of this case; the first two-week trial resulted in a mistrial due to the COVID-19 pandemic. Thus, a reversal of the jury verdict in this case would mean the Lipp family would endure a third trial in the case against Philip Morris for the death of their wife and mother, a death that was admittedly caused by her smoking of the company's product.

[6] As the trial court instructed the jury, in order to establish Norma Lipp was a member of the <u>Engle</u> class, Plaintiff had to prove "prove by the greater weight of the evidence that Norma Lipp was addicted to cigarettes containing

20

entitled to rely on, and the jury was required to accept, certain preclusive

Engle findings. As such, the trial court delivered the following instruction to

the jury:

> If you find that Norma Lipp was a member of the "Engle" class, the following "Engle" findings **must** be applied in this case.
>
> Smoking cigarettes causes lung cancer.
>
> Nicotine in cigarettes is addictive.
>
> Philip Morris placed cigarettes on the market that were defective and unreasonably dangerous.
> Philip Morris was negligent.
>
> Philip Morris concealed or omitted material information not otherwise known or available, knowing that the material was false and misleading, or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both.
>
> Philip Morris entered into an agreement to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment.

(Emphasis added).

The judge instructed the jurors that they could not deny or question

these findings, and that these findings carry the same weight as if the jurors

had reached these determinations on their own.

---

nicotine and, if so, that such addiction was a legal cause of her lung cancer and death." See Engle v. Liggett Grp., Inc., 945 So. 2d 1246 (Fla. 2006).

Additionally, the parties stipulated to certain facts, further narrowing the disputed issues at trial. For example, the jury was instructed:

> Members of the jury, the parties have agreed to certain facts. You must accept these facts as true. There is no dispute that the decedent, Norma Lipp, had lung cancer. <u>There is no dispute in this case that the cigarettes Ms. Lipp smoked, including the cigarettes manufactured by Philip Morris USA Incorporated, were the medical cause of her lung cancer and death</u>.

(Emphasis added).

At trial, Plaintiff presented substantial and largely unrebutted evidence that Philip Morris engaged in a campaign to make smokers believe that cigarettes weren't injurious to their health, and that the production and sale of filtered cigarettes was a part of the plan to reassure smokers by fooling them into believing that filtered cigarettes would be cleaner and safer. Plaintiff provided expert testimony and other evidence that in fact filtered cigarettes were no safer than unfiltered cigarettes,[7] that Philip Morris <u>knew this from its own research</u>, but, nonetheless, told the public that filtered cigarettes were safer. Plaintiff's expert, Dr. Proctor, testified that Philip Morris knew smokers were switching to filtered cigarettes because they thought they were safe—that this was in fact the entire point of marketing

---

[7] Dr. Proctor testified at trial that the illusion that filtered cigarettes are safer is "entirely fake. . . . They're not even filters . . in any sense of the word. . . . [and] cancer rates kept going up even after filters."

filtered cigarettes beginning in 1954.  Dr. Proctor gave specific examples culled from Philip Morris documents, including an internal memo that specifically showed Philip Morris "knew that the so-called high filtration cigarettes were no different."  Dr. Proctor testified that Philip Morris' head of research, in a 1961 internal document, reported that "present technology does not permit selective filtration of particulate smoke." Nevertheless, in a letter to the United States Surgeon General two years later, Philip Morris reported that cigarettes were not dangerous and also, that "it is possible, of course, to modify the chemical composition of cigarette smoke by the use of filters."  These documents were admitted into evidence at trial and submitted to the jury for its consideration on the issue of whether Philip Morris marketed their filtered cigarettes as "safer" while knowing the opposite was true.

**The Erroneously Admitted Testimony**

It is in this context—considering the stipulated facts and preclusive Engle findings, as well as substantial evidence of Philip Morris' knowledge and conduct—that we review the testimony which the majority relies upon to reverse the jury verdict in this two-week trial.  It consists of a few lines of testimony from Norma's two sons, A.J. and Michael, and one sentence by Plaintiff's counsel during closing.

Specifically, Norma's son A.J. testified:

Q. After she had her lung removed, okay, did she ever express to you that she was upset?

. . .

A. Okay. Yeah. After her surgery, she was very upset at the tobacco companies specifically.

. . .

A. Because she was upset at **the tobacco companies because they told her that filtered cigarettes – that filters would filter out the bad stuff and keep her safe** and she knew once she got lung cancer and had her lung removed that the filter didn't keep her safe and didn't filter out the bad stuff.

(Emphasis added to highlight the objectionable portion raised by Philip Morris on appeal.)

Norma's other son, Michael, testified that after his mother was diagnosed with lung cancer, she told him why she was angry at the cigarette companies:

Q. Did she tell you why she was angry at the tobacco companies?

A. She said, "**They lied to me**." She said—

Defense counsel: Objection. Hearsay.

Court: Overruled.

A. So she was mad that she was dying. She said, "**Cigarette companies lied to me**. I wish I'd never smoked." And then she made me promise that I would never smoke.

24

(Emphasis added to highlight the objectionable portion raised by Philip Morris on appeal).

Plaintiff's counsel later referred to the above testimony during closing arguments, telling the jury: "She was angry when she found out that **she was lied to. She believed them, that filters were going to keep her safe, that it was safer**." (Emphasis added.)

This is the testimony and comment by counsel relied upon by the majority to reverse the jury's verdict.  And although this testimony is hearsay because of <u>when</u> Norma made these statements to her sons, <u>see</u> § 90.803(3)((b), Fla. Stat. (2021) (while statements are admissible to prove one's then-existing state of mind, "[a]n after-the-fact statement of memory or belief to prove the fact remembered or believed" is inadmissible), this hearsay testimony, in the context of the other testimony and evidence presented to the jury, was at most cumulative.  This point is most clearly established by the nearly identical (and unobjected to) testimony presented to the jury through Norma's sons and husband.

### Nearly Identical Testimony Was Properly Presented to the Jury, Rendering the Erroneously Admitted Testimony Cumulative

The evidentiary impediment to the admissibility of the above-described testimony of Norma's sons, A.J. and Michael, was a temporal one.  Norma's statements, as testified to by A.J. and Michael, were hearsay only because

25

she made them after she had already quit (or nearly quit) smoking, and therefore her state of mind at that point in time was not relevant to the issues in dispute. Norma's out-of-court statements were admissible to prove her then-existing state of mind, but only "when such a state is at issue in the action." § 90.803(3)(b), Fla. Stat. (2021). This is, of course, a somewhat nuanced evidentiary distinction, but nevertheless a valid basis to characterize the above-described testimony of A.J. and Michael as hearsay. And if this was the only evidence presented to the jury to prove Norma's state of mind about why she was continuing to smoke cigarettes, I would be joining, rather than dissenting from, the majority opinion.

However, this testimony was not the only evidence presented by Plaintiff to the jury on this issue of why Norma continued to smoke cigarettes. Indeed, several witnesses testified at trial that Norma told them (at a time when she was still smoking cigarettes) that the reason she continued to smoke was because she believed the filtered cigarettes were safer, and that her belief was based on what she had been told by the cigarette companies. This testimony was not hearsay, and was properly admitted in order to establish Norma's then-existing state of mind, rather than an after-the-fact statement of memory or belief to prove the fact remembered or believed.

For example:

26

Norma's two sons, A.J. and Michael, each testified that Norma told them, at a time when she was still smoking cigarettes, that she did so because the filtered cigarettes she was smoking were safer. A.J. testified that he asked his mother about this after he heard in high school that smoking could be bad for her: "When I told her, she said, AJ, I only smoke cigarettes that have filters. . . . She said that she continued to smoke because she only smoked cigarettes that had filters, and she makes sure that she . . . only smokes filtered cigarettes, and that the filters will filter out the bad stuff and keep her safe." Similarly, Michael testified that his mother told him he needn't worry about her continuing to smoke because she believed filtered cigarettes were safe.

Norma's husband, Jules, testified that his wife Norma "believed that what she read in the magazines or she showed me the articles showing that there was no proof that cigarette smoking caused cancer. And . . . she would show me the advertisements showing that the filters in cigarettes would take out the bad stuff."

Jules also testified (without objection) that when Norma was diagnosed with cancer and while she was still smoking, she learned that these advertisements—showing that the filters would "take out the bad stuff"— were not true, and that she was upset when she found this out because "she

27

believed the magazine articles that said that smoking – there's no proof that smoking caused cancer, and also that the filters in cigarettes would take out the bad stuff." Jules also testified that Norma told him that, had she known earlier, "[s]he never would have become addicted."

This properly presented testimony, taken together with the preclusive Engle findings, the pretrial stipulations, and the substantial expert testimony presented by Plaintiff to show Philip Morris lied to and deceived Norma about the safety of filtered cigarettes, rendered the fragments of inadmissible hearsay, relied upon by the majority for reversal, merely cumulative.

As the Florida Supreme Court recognized, the test first announced for criminal appeals in DiGuilio, and later adopted for civil appeals in Special, "will foster consistency in appellate courts' analyses of harmless error." Special, 160 So. 3d at 1257. Consistent analysis and application of the harmless error test to the instant case leads inescapably to one conclusion: there is no reasonable possibility the cumulative testimony admitted at trial contributed to the verdict in this case, and thus the erroneous admission of that testimony was harmless beyond a reasonable doubt. Special, 160 So. 3d at 1254-55 ("The purpose of the harmless error analysis is to 'conserve judicial labor by holding harmless those errors which, in the context of a case, do not vitiate the right to a fair trial and, thus, do not require a new trial'")

(quoting DiGuilio, 491 So. 2d at 1135); Torres-Arboledo v. State, 524 So. 2d 403, 408 (Fla. 1988) (holding that where improperly admitted hearsay testimony is merely cumulative to other properly admitted testimony, the admission of the hearsay testimony was harmless beyond a reasonable doubt and did not warrant a new trial); Floyd v. State, 850 So. 2d 383 (Fla. 2002) (same); Casica v. State, 24 So. 3d 1236 (Fla. 4th DCA 2009) (same); Miles v. State, 839 So. 2d 814 (Fla. 4th DCA 2003) (same).[8]

I therefore would affirm the jury's verdict and the final judgment, and must respectfully dissent.

---

[8] Though not contained in the majority's analysis, to the extent that counsel's reiteration in closing that "they lied to me" might somehow be viewed as independently improper, it must be remembered that the jury was called upon to determine by its verdict whether Plaintiff had proven, by clear and convincing evidence, entitlement to punitive damages and, if so, in what amount. See R.J. Reynolds Tobacco Co. v. Schleider, 273 So. 3d 63, 68 (Fla. 3d DCA 2018) ("Arguments inappropriate in a simple negligence case may be appropriate concerning record evidence of a party's intentional misconduct in the context of a claim for punitive damages. To give an obvious example, it is generally reversible error in a simple tort case seeking compensatory damages to ask a jury to 'send a message' and punish or penalize the defendant. See, e.g., Erie Ins. Co. v. Bushy, 394 So.2d 228, 229 (Fla. 5th DCA 1981). Here, however, the jury was instructed to consider whether R.J. Reynolds committed intentional misconduct, meaning 'Reynolds had actual knowledge of the wrong of the conduct and the high probability that injury would result and, despite that knowledge intentionally pursued that course of conduct,' in which event the jury was directed to consider the propriety of punitive damages 'as a punishment to Reynolds and as a deterrent to others.'")